**In re Charles L. MELENYZER, Debtor.**

**Bankruptcy No. 5–85–00338C.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

April 20, 1992.

144

Lawrence A. Beck, Beck & Beck, P.C., San Antonio, Tex., for George A. Benz.

James S. Wilkins, San Antonio, Tex., for Trustee Martin W. Seidler.

Bill Frazell, Asst. U.S. Trustee, San Antonio, Tex.

## DECISION AND ORDER ON CREDITOR BENZ' OBJECTIONS TO TRUSTEE'S FINAL REPORT AND ACCOUNTING

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing, the objections of Creditor George A. Benz to the Trustee's Final Report and Accounting. For the reasons discussed herein, the court finds and concludes that Creditor Benz' objections should be SUSTAINED IN PART and OVERRULED IN PART.

### JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157 and 11 U.S.C. §§ 105, 704. This is a core proceeding, as defined by 28 U.S.C. § 157(b)(2)(A).

### BACKGROUND FACTS

On September 13, 1991, Creditor George A. Benz [1] filed his objections to the Trustee's Final Report and Accounting. For the most part, Mr. Benz' objections allege vari-

---

1. Mr. Benz is an unsecured creditor of this estate, whose claim for $20,801.45 the Trustee proposes to pay in full.

ous technical defects with the Final Report and Accounting. The court finds the Trustee has adequately answered these technical objections and/or remedied the problems they address in his Reply to George Benz' Objection (filed January 8, 1992), the Chapter 7 Trustee's First Amended Final Report and Account (filed January 3, 1992), and during the several days of hearings which took place in mid-January, 1992. Not yet addressed by the Amended Final Report, however, is Benz' claim to post-petition interest.[2] Also of continuing concern are Benz' allegations that Trustee (Martin W. Seidler) should be denied any fees from the bankruptcy estate because he has breached his duties under 11 U.S.C. §§ 704 and 345.[3] In addition, Benz requests that the court (1) disapprove payment of any additional fees to Mr. Seidler in his capacity as attorney to the Trustee, to the Trustee's special counsel (James Wilkins), and to the Trustee's accountant (John C. Calhoun); (2) determine whether these same persons should disgorge any fees previously paid to them from the bankruptcy estate; and (3) surcharge the Trustee for what Benz claims was the Trustee's wrongful conduct in his administration of this estate.

2. This objection is raised in paragraph 26 of Mr. Benz' pleading:

26. The provisions for distribution to George Benz does [sic] not include the payment of interest.

3. Specifically, Benz alleges that the Trustee has:

a. Failed to close the estate as expeditiously as is compatible with the best interests of the parties.

b. Failed to be accountable for all property received.

c. Failed to properly investigate the financial affairs of the debtor.

d. Failed to furnish such information concerning the estate and the estate's administration as is requested by a party in interest.

e. Failed to make a true and correct final report and final accounting of the administration of the estate with the court.

f. Failed to invest the money of the estate as required by law.

g. Failed to keep a proper and accurate record of receipts and the disposition of money received.

h. Negligently filed reports and summaries required by law.

i. Failed to timely file an inventory.

## DISCUSSION

Although this bankruptcy has spanned nearly seven years and has generated a dozen volumes of documents, the court has carefully reviewed (1) the entire chronology of this case, pleading by pleading, (2) the evidence presented at three days' of hearing on the Final Report, and (3) the relevant law. Certainly, given the gravity of Benz' charges of wrongdoing by officers of the court, no appropriate resolution of these matters could have been made except in the context of this case in its totality.

### The Chronology of the Case

Dr. Charles Melenyzer initially filed bankruptcy under Chapter 13 on April 24, 1985, a few months after his wife of about one year, Carmen Melenyzer, filed a divorce petition in state court. Approximately three months later, on July 16, 1985, Dr. Melenyzer filed a motion to convert to Chapter 7. Among his reasons for seeking conversion, the doctor stated that he could no longer file a viable Chapter 13 plan because he had been unable to settle his tax liability with the Internal Revenue Ser-

j. Failed to give notice of the case to every entity known to be holding money or property subject to withdrawal or order of the debtor.

k. Failed to account for the contents of safety deposit boxes.

l. Wasted the assets of the estate.

m. Failed to maintain the assets of the estate and to take care of the assets of the estate as required by law.

n. Incurred unnecessary expenses including legal fees and service fees.

o. Maintained accounts and allowed money to be held by various real estate agents and title companies without reporting such facts to the court.

p. Failed to properly document his expenses in the final report.

q. Made an unauthorized charitable donation in the amount of $20,756.21, and without notice to creditors; and then failed to collect the full remaining amount due pursuant to the terms of the sale.

r. Failed to reasonably exercise discretion in compliance with orders of this Court directing that certain community assets belonging to this bankruptcy estate be distributed to Carmen Melenyzer.

The Trustee, of course, denied all of these allegations in his reply to Mr. Benz' objections.

vice (I.R.S.). On July 19, 1985, an order was entered converting the case to a Chapter 7. On July 22, 1985, Martin W. Seidler was appointed interim trustee. Three days later, an order for meeting of creditors, combined with notice thereof and of automatic stay was entered. This order was stamped: "NO ASSET—DO NOT FILE A CLAIM." The order also contained a special notice:

It appears from the schedules of the debtor that there are no assets from which any dividend can be paid to creditors. It is unnecessary for any creditor to file his claim at this time in order to share in any distribution from the estate. If it subsequently appears that there are assets from which a dividend may be paid, creditors will be so notified and given an opportunity to file their claims.

In early August 1985, Carmen Melenyzer filed her notice of appearance and request for service of papers in the Chapter 7 case. The actual document is missing from the file, but according to the Clerk's records, Ms. Melenyzer filed this pleading on August 1, 1985.[4] Since then, Carmen Melenyzer has been an active participant in this bankruptcy. On August 6, 1985, Ms. Melenyzer, as next friend of Russell Glen Melenyzer,[5] sought relief from stay, alleging that "CHARLES MELENYZER owns sufficient property to pay his bills, and that he is not bankrupt."[6] Further, Ms. Melenyzer claimed: "Debtor holds property, in trust, actual and/or constructive which should be available for the support of his minor son. Debtor therefore has equity in the Trust property. To allow Debtor to retain control of such property is depriving

the said child of his right to obtain child support without due process of law." In paragraph 7 of the same pleading, Ms. Melenyzer stated, "In the event stays are allowed to remain in effect, Debtor will have enriched himself by *false pretenses, false representations* and *actionable fraud* which is prohibited and not dischargeable under 11 U.S.C. 523(a)(2)" (emphasis added). This motion for relief from stay was overruled by an order entered on September 17, 1985, because neither Ms. Melenyzer nor her attorney appeared or answered the call of the docket. Nevertheless, Ms. Melenyzer's motion put the Trustee on notice of the debtor's possible fraud and concealment of assets, requiring the Trustee to investigate further. *See* 11 U.S.C. § 704(1), (4).[7]

In the meantime, the Trustee objected to the debtor's claims of exemptions and filed an ex parte motion to compel the debtor to file a statement of affairs and amended schedules.[8] Shortly thereafter,[9] Ben Wallis filed a motion to withdraw as Debtor's counsel. In his motion, Mr. Wallis cited the following reasons, among others:

1. Debtor has continuously failed and refused to cooperate with his attorney in the following particulars:

(a) failure to follow instructions regarding his duty to disclose all information pertinent to this case to the attorneys

(b) failure to follow explicit instructions to return a completed 1st meeting questionnaire, before leaving the meeting, as he was ordered to do by

4. The court notes that several documents are missing from this file. Although the Clerk's office has attempted to obtain replacement copies, many of the documents are still missing.

Carmen Melenyzer was, at that time, married to the debtor Charles Melenyzer. The Chapter 13 petition was filed shortly after Ms. Melenyzer filed for divorce and frustrated her attempts to get child support and a share of the marital property. The Melenyzers were subsequently divorced, during the pendency of the Chapter 7 case.

5. Russell Glen Melenyzer was the only son of Carmen Melenyzer and the debtor, Dr. Charles Melenyzer, by their short marriage.

6. At this time, Ms. Melenyzer was represented by Shirley A. Ehrlich.

7. Ms. Melenyzer has repeatedly testified in this case that she told the Trustee on many occasions of her husband's failure to disclose all of his assets and of a bogus trust, the Melenyzer Trust.

8. September 5, 1985.

9. September 11, 1985.

the hearing examiner, Mr. Dan Cretaro, on August 29, 1985

(c) failure to keep the attorneys advised of his whereabouts

(d) failure to keep scheduled appointments at his attorney's office

(e) failure to cooperate with the office staff at said attorney's office, culminating in a physical confrontation with one staff member.

2. All of the above significantly impairs the ability of the undersigned attorney to represent the Debtor in an honest, forthright and competent manner in accordance with the duties imposed by the Code of Professional Responsibility.

On September 17, 1985, this motion to withdraw was granted, as was the Trustee's ex parte motion to compel. Two days later, Ms. Melenyzer filed a motion for relief from stay to permit her divorce from the debtor and the attendant suit affecting the parent/child relationship (SAPCR) to proceed in state court. An order granting this motion was entered on September 25, 1985. On the same day, pursuant to his statutory duty under 11 U.S.C. § 704(6),[10] the Trustee filed a complaint objecting to the debtor's discharge under 11 U.S.C. §§ 727(a)(2), (3), (4), (6) and/or (7). In his Complaint Objecting to Discharge, the Trustee alleged, inter alia, (1) that the debtor fraudulently transferred real property worth more than $50,000; (2) that the debtor knowingly and fraudulently made various materially false statements, under oath, in preparing his schedules; (3) that the debtor concealed, destroyed, mutilated, falsified, or failed to keep or preserve records and documents regarding his financial condition and business transactions; (4) that the debtor made various false statements under oath at the Section 341 meeting; and (5) that the debtor concealed his interest in the sham Melenyzer Trust. The court ultimately found that the Debtor had indeed violated sections 727(a)(2)(B), (3), and (4)(A) and denied the debtor's discharge some years later.[11]

On September 26, 1985, Debtor filed his First Amended Petition and Schedules. According to these documents, Debtor's debts totalled $114,320.73, and the total value of his property, including exempt property, was $223,187.27. In early October 1985, Debtor filed a motion to dismiss the Chapter 7 case, which was denied on December 19, 1985.[12]

In mid-November 1985, the Trustee filed an Interim Report, wherein he reported a bank balance of $3610.86 and that recovery of fraudulent transfers and objection to discharge were matters pending. At this point, the Trustee's anticipated closing date was late 1986. By February 3, 1986, the Trustee's Interim Report remained the same, except that the bank balance had grown to $19,242.63. On April 28, 1986, the Interim Report showed that the bank balance had dropped to $17,195.38 and that $3532.25 had been paid to John C. Calhoun & Co. for accounting services rendered to the Trustee. The fee application which led to this payment indicated that Mr. Calhoun was charging the estate for professional

---

**10.** The statute directs the trustee, where advisable, to oppose the discharge of the debtor. 11 U.S.C. § 704(6). At this point in the case, such opposition appears to have been advisable.

**11.** The court entered partial findings of fact and conclusions of law on the Trustee's Objection to Discharge on April 12, 1988, but Judgment Denying Debtor's Discharge was not entered until January 12, 1990, when a form of judgment was submitted by the Trustee at the direction of the court. In his reply to Creditor Benz' objections, the Trustee explained that the order actually denying discharge was not entered until several years after the suit was filed because the debtor had been a fugitive from justice and had fled to Pennsylvania for one year, thereby delaying final disposition of the matter. Dr. Melenyzer had been illegally dispensing prescription drugs. When he was ultimately returned to Texas, he was convicted and sentenced to serve a term in the state penitentiary in Huntsville, Texas. In fact, the delay in the entry of the judgment appears to have been an oversight on the part of the Trustee, though it was an oversight with no real consequences, as the denial of the discharge was a foregone conclusion after the trial of the matter.

**12.** The judge presiding over the case at that time was the Honorable R. Glen Ayers. Four different bankruptcy judges have been assigned this case during its course: Judge Joseph C. Elliott, Judge R. Glen Ayers, Judge Larry E. Kelly, and Judge Leif M. Clark.

services related to "determining the estate's tax liability and *auditing financial records to document and recover concealed estate assets*" (emphasis added). Several subsequent Calhoun fee applications indicated that he continued to render the same sorts of services to the Trustee for quite some time, much to the dismay of the debtor. On February 14, 1986, Debtor objected to the first Calhoun fee application, claiming that "Debtor's estate should not be held liable for expenses for some *witch hunt* conducted by the Trustee which is not beneficial to either the Debtor or his creditors" (emphasis added). Nevertheless, the search for concealed assets continued, largely prompted by information provided to the Trustee by Ms. Melenyzer.[13]

In June 1986, Ms. Melenyzer filed an ex parte Motion to Compel the Trustee to Release Community Funds.[14] In this motion, Ms. Melenyzer alleged that the Trustee, in collecting certain community property accounts, had also collected her one-half interest, which she maintained should be released to her at once. On September 11, 1986, Debtor filed an objection to this motion, disputing Ms. Melenyzer's claim of any interest in the properties described in her motion to compel. On September 29, 1986, the court, Judge R. Glen Ayers presiding, entered an order determining separate and community property and compelling the Trustee to release certain funds. In essence, this order stated that the North Belt Venture, North Belt Venture III, and Pasadena Venture properties were the separate property of the debtor, but that any income from these properties was presumptively community property because the debtor had failed to demonstrate that the income was separate property. *See* Tex.Fam.Code Ann. § 5.02 (Vernon Supp.1992).[15] The Trustee was ordered to disburse, *"at his sole discretion,"* one-half of this community property income to Carmen Melenyzer (emphasis added).[16]

On May 4, 1987, the Trustee filed an application to employ special counsel (James Wilkins) to recover concealed assets, to litigate dischargeability, and to represent the Trustee in litigation concerning a sham trust. Much of the information regarding these matters had been supplied

---

**13.** *See* Note 17, *infra.; see also* text at Note 19 and following, *infra.*

**14.** At this time, Ms. Melenyzer was represented by Ollie Mayo.

**15.** In its entirety, Section 5.02 of the Family Code reads:

Property possessed by either spouse during or on dissolution of marriage is presumed to be community property. The degree of proof necessary to establish that property is separate property is clear and convincing evidence.

**16.** This order was actually improper because 11 U.S.C. § 541(a)(2) includes the following as property of the estate:

(2) All interests of the debtor *and the debtor's spouse in community property* as of the commencement of the case that is—
 (A) the sole, equal, or joint management and control of the debtor; or
 (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such an interest is so liable.

11 U.S.C. § 541(a)(2) (emphasis added). The community property at issue here was the income from Dr. Melenyzer's separate property business ventures. This income was most likely his sole management community property, unless it was commingled with other community property, in which case it became joint management community property. Tex.Fam.Code Ann. § 5.22 (Vernon 1975). Under Texas law, all of a spouse's sole management *community property* is subject to the liabilities of that spouse. Tex. Fam.Code Ann. § 5.61(b), (c) (Vernon 1975 & Supp.1992). In addition, all joint management *community property* is subject to the liabilities incurred by either spouse prior to or during marriage. *Id.* § 5.61(c). Also, *all community property*—whether under sole or joint management—is subject to either spouse's tortious liability or liability for necessaries. Tex.Fam.Code Ann. §§ 5.61(d); 4.02; 4.031 (Vernon 1975 & Supp.1992). A bankruptcy trustee can, and must, use community property which is property of the estate to pay creditors, notwithstanding the non-debtor spouse's interest in the property. The mere determination that certain property belongs to the community estate does not make the non-debtor spouse immediately entitled to receive and spend her one-half interest. The ruling was thus incorrect. Fortunately for this bankruptcy estate, Judge Ayers' order was made contingent upon the Trustee's "sole discretion," and the Trustee wisely opted not to disburse the funds to Carmen Melenyzer.

to the Trustee by Carmen Melenyzer.[17] An order granting this application was entered on May 13, 1987. On July 25, 1987, the Trustee's Interim Report indicated that the bank balance was $29,740.99, but that approximately "One million dollars in real estate transferred to [a] bogus trust" remained to be liquidated. As of this Interim Report, the anticipated closing date was moved to late 1988.

On October 29, 1987, Carmen Melenyzer filed a Motion to Compel Trustee to Return Separate Property, namely a gold and silver coin collection which she claimed the debtor gave to her as a gift prior to their marriage.[18] In his November 5th response to this motion, the Trustee represented that "CARMEN MELENYZER, the Movant, turned the gold and silver collection over to the Trustee and admitted to him that this collection was the property of the Debtor, CHARLES L. MELENYZER, and was not the property of the Movant, CARMEN MELENYZER." On December 16, 1987, a hearing was held on this matter, and the motion was ultimately dismissed for lack of compliance with the Local Bankruptcy Rules.

On January 26, 1988, Carmen Melenyzer filed a Motion for Payment of Administrative Expense, wherein she claimed that she had been "actively assisting the Trustee, MARTIN W. SEIDLER, in locating assets of the Debtor's estate," that her "assistance was essential in the location of the assets," and that her "assistance was re-quested by the Trustee." [19] The Motion further said that "Movant engaged in assisting the Trustee and augmenting the estate for the creditors soon after the petition was filed, and she has been assisting trustee over the past two year [sic] period." As a result of her assistance to the Trustee and to the court, Ms. Melenyzer claimed, she incurred out-of-pocket expenses totaling $4,177.37—of which $677.37 was for telephone bills, and $3500 was for "salaries for employees, personally paid by movant ... for searching voluminous records and documents of the debtor's business for information concerning the debtor's business and personal assets." On April 14, 1988, the court entered an order authorizing partial payment to Ms. Melenyzer, to compensate her for the phone bills. The court found no evidence that Ms. Melenyzer ever had any employees, much less that they had performed any valuable services for the estate.

Before the court ruled on her application for payment of administrative expenses, however, Ms. Melenyzer filed another Motion for Relief from Stay to enable her to enforce the state court's divorce decree.[20] This motion was dismissed for improper service. On March 14, 1988, the motion was refiled, and then withdrawn altogether on May 10, 1988. Nevertheless, the Trustee was obliged to respond to the motions to lift stay.

In mid–1988, the Melenyzer Trust litigation finally went to trial.[21] The Trustee

17. The September 11, 1987, fee application of Martin Seidler, in his capacity as counsel to the Trustee, indicated the following:

I

Your Applicant filed suit to set aside bogus trust into which the debtor transferred various parcels of real property worth approximately $1,000,000.00 and obtained a restraining Order [sic] preventing two trust asset lienholders from foreclosing on parcels of real property of the debtor's estate, filed an objection to debtor's discharge and has recovered $10,000.00 concealed from the Trustee and various gold and silver coins, and defended a lift stay motion by San Antonio Savings Association with regard to the debtor's Cobblestone property and in connection with his representation of the Trustee has expended a [sic] 48.90 hours in this regard.

The fee detail indicated that the Trustee's counsel pursued several avenues to discover concealed assets of the estate, including conferring with Carmen Melenyzer regarding these assets on September 11, 1985. See also text at Note 19 and following, infra.

18. At this time Ms. Melenyzer was appearing pro se.

19. At this time, Ms. Melenyzer was represented by George Scharmen.

20. At this time, Ms. Melenyzer was still represented by George Scharmen.

21. Trial of this matter, like the trial of the discharge litigation, had been delayed by the fact that Dr. Melenyzer was a fugitive from justice for three years.

sought to recover for the estate various pieces of real estate held by this "trust," which, according to Carmen Melenyzer was a sham trust (a position with which the Trustee agreed). One of the properties ostensibly held by this trust was a house at 104 Cobblestone in San Antonio, where the debtor and Carmen Melenyzer had lived during their marriage.[22] On the eve of trial, the Trustee settled with the Melenyzer Trust. Under the terms of the settlement, virtually all the real property was to be conveyed to the Trustee, except for the house at 104 Cobblestone (where Ms. Melenyzer was then living with her son), which was to remain in the trust. Notice of the settlement was given to all parties, including Carmen Melenyzer. Only the IRS objected, but its objection was resolved. Ms. Melenyzer never filed a timely objection, despite the fact that she deeply opposed losing what she believed to be her entitlement to the house at 104 Cobblestone.[23]

On September 15, 1988, more than three years after the case was converted to a

Chapter 7, the Trustee informed the Clerk's office that the estate, previously noticed as a "NO ASSET" case, finally had funds available for distribution to creditors.[24] Additionally, the Trustee requested the Clerk's office to notice all creditors and parties-in-interest to file their claims within ninety (90) days of the date of notice. The Clerk's office sent this notice to creditors on January 9, 1989, and the bar date for filing proofs of claim was set at April 3, 1989. Despite her prior repeated efforts to avail herself of estate assets, Carmen Melenyzer never filed a proof of claim either for herself or on behalf of her son, Russell Glen Melenyzer.

As a result of her failure to file a proof of claim, Ms. Melenyzer lacked standing to continue filing pleadings in this bankruptcy, so she altered her approach and began to urge her causes under the guise of protecting her son's interests.[25] Her son, in turn, was represented by his state-court-appointed attorney ad litem, Terry Curry Peace.[26] On January 11, 1989, on behalf of

22. The house was not acquired during the marriage, however. Dr. Melenyzer had purchased the house many years before, during his first marriage. His first wife had died. Had the house not been conveyed into the Melenyzer Trust, it would have been held by tenancy in common by Dr. Melenyzer and his children by his first marriage. These children were also the beneficiaries of the Melenyzer Trust.

23. In fact, she had no interest in the house because Dr. Melenyzer only owned a ½ interest in the property, and that was his separate property acquired long prior to the marriage. Nonetheless, Carmen Melenyzer refused to accept that fact and insisted that she needed the house for her son, that it was hers by right because of her marriage, that her son had an interest in the Melenyzer Trust, and so forth. Much of the litigation that followed over the next two years centered on her insistence that she should keep the house and on her efforts to wrest the house out of the bankruptcy estate.

Although this court ultimately ruled that neither Ms. Melenyzer nor her son had a protectable interest in the Cobblestone property, they still managed to live there rent-free for six years post-petition, until the trust litigation was resolved. During that time, the Trustee made the mortgage payments in an effort to protect any equity the estate had in the property. After the settlement was finalized, beneficiaries of the Melenyzer Trust (the children of Dr. Melenyzer by his first marriage) evicted Ms. Melenyzer and her son from the house.

24. Clearly, during the three-year period following conversion, the Trustee—pursuant to his statutory duties—had managed to recover sufficient assets to make some sort of distribution to the creditors possible. *See* 11 *U.S.C.* § 704. But for these efforts, the case would probably have been closed as a "NO ASSET" case, without any distribution at all.

25. Ms. Melenyzer made repeated entreaties to this court, complaining of the hardships her son was being forced to endure because of this bankruptcy. The court notes that the one thing Ms. Melenyzer did not, and would not, do was get a job.

26. The state divorce court has the authority to appoint an ad litem to protect the interests of a minor child. No effort was made to have such an ad litem appointed until late in 1988—four years after the divorce was filed—and for no apparent reason other than to justify the appearance of a new party in the bankruptcy. The ad litem played no discernable role whatsoever in the divorce proceeding. Although Ms. Peace later filed a motion requesting the appointment of *two* ad litems in the bankruptcy case, the bankruptcy court found no justification for such an appointment. However, the court did, as a matter of comity, recognize the state court's appointment of the ad litems (Ms. Peace and later Mr. Lawrence Beck) and permitted them to appear in the bankruptcy case on behalf of Russell Glen Melenyzer.

Russell Glen Melenyzer, Ms. Peace filed a Motion to Compel the Trustee to Pay Child Support Arrearages. Once again, the Trustee responded to the pleading, pointing out that the referenced child support payments were post-petition debts for which the bankruptcy estate was not liable. Further, the Trustee alleged that the motion was frivolous and without foundation. On April 14, 1989, the court entered a sua sponte order requiring both sides to submit briefs and affidavits before April 30, 1989, to assist the court is resolving the issues contained within the motion.[27] One of the issues was whether Russell Glen Melenyzer's interests had been adequately represented by his mother in the bankruptcy case. The ad litems [28] objected that Russell Glen Melenyzer should have received independent notice of the settlement of the Melenyzer Trust litigation.[29]

On January 23, 1989, Ben A. Wallis, Jr., as creditor of the estate (by virtue of unpaid attorney's fees), filed an objection to the Trustee's notice of intention to sell estate property. The Trustee responded to this objection on January 27, 1989, pointing out that if the Trustee "does not sell the estate property or reduce the same to cash, there can never be a distribution to creditors." This objection was overruled on May 16, 1989. In the meantime, on January 25, 1989, Ms. Peace, in her capacity as attorney ad litem for Russell Glen Melenyzer, also filed an objection to the sale of estate property on the child's behalf. This objection was subsequently withdrawn on March 2, 1989. On March 17, 1989, however, the Trustee filed a pleading styled, "Trustee's Response to Objection of Russell Glen Melenyzer, III, a Minor, To Notice of Intention to Sell Estate Property." This response indicated that Carmen Melenyzer, pro se, had filed the very same objection which her son's attorney ad litem had previously filed and then withdrawn. Further the Trustee alleged that the objection was brought "for the sole purpose of harassment and bad faith," therefore warranting the imposition of sanctions against Ms. Melenyzer.

On April 12, 1989, Terry Curry Peace filed a Motion for Appointment of Ad Litems, in which she asked the court to recognize both her and Lawrence Beck as attorneys ad litem for Russell Glen Melenyzer. Two days later, Mr. Beck filed a Motion to Compel Trustee to Perform Trustee's Duties, wherein he alleged that the Trustee had failed to close the estate expeditiously, among other things.[30] Four

---

**27.** In his Reply to Benz' Objections, the Trustee stated, "This court has ruled that the estate is not liable for child support to Carmen Melenyzer." In this same paragraph, the Trustee also made reference to requesting an order on this issue in his final report and accounting. This order would "supersede and clarify the court's prior orders in terms of distribution of funds."

**28.** By this time, there were *two* ad litems, Ms. Peace and Mr. Lawrence Beck, whose involvement in this case is discussed further below.

**29.** No ad litem was in place at the time of the settlement was noticed by the Trustee. Ms. Melenyzer, as Russell Glen's mother, of course represented his interests as a minor child in the bankruptcy case, and she *did* have notice of the settlement.

**30.** Although Mr. Beck now officially represents George Benz, the court notes that Mr. Benz has been remarkably disinterested in this case until recently, when Mr. Beck began representing him. Further, the arguments now advanced by Mr. Benz, through his attorney Mr. Beck, are strikingly similar to the arguments which Mr. Beck made in his capacity as attorney ad litem to Russell Glen Melenyzer. The Motion to Compel on behalf of the child read, in part:

> 4. Movant believes that the trustee has failed to perform his duties pursuant to 11 U.S.C. § 704 and Bankruptcy Rule 2015 as follows:
> a. Trustee has failed to close this estate as expeditiously as is compatible with the best interests of parties in interest;
> b. Trustee has failed to account for all property received by the trustee;
> c. Trustee has repeatedly failed to reasonably furnish information concerning the estate and the estate's administration as has been requested by Carmen Melenyzer, who is the wife of the debtor and mother of movant; and
> d. Trustee has failed to file a complete inventory of the debtor.

Comparing these charges with those cited at Note 3 reveals their similarity.

Interestingly enough, although Mr. Beck was supposedly not representing Carmen Melenyzer in either proceeding, both pleadings raise grievances on her behalf. One must wonder who Mr. Beck's real client was. Then, as now, Mr. Beck's arguments appear to be thinly disguised attempts by Carmen Melenyzer to get money

days after that, Mr. Beck filed a Motion to Expedite Hearings on Various Motions Filed by Russell Glen Melenyzer. The Trustee was forced to respond to each of these pleadings. In his April 25th response to the motion to compel, the Trustee indicated that an adversary to determine debtor's tax liability was still pending and that no distribution could be made until that matter was resolved. Furthermore, until the Melenyzer Trust litigation settlement was finalized, the Trustee could not dispose of any property which was the subject of that litigation. By their objections, however, Ms. Peace and Mr. Beck, prolonged final resolution of the trust litigation until early 1990. The Trustee filed an inventory and appraisement on June 6, 1989.

As the previous summary of events shows, prior to Mr. Beck's involvement in the case, Ms. Melenyzer had established a pattern of filing pleadings every few months, trying numerous and increasingly novel approaches to gain access to estate assets.[31] From the time that Mr. Beck became involved in the case, however, the pace of such filings picked up markedly. Recounting each of these pleadings here would be impractical, inasmuch as they were sometimes filed at a staggering rate of several per month. In his first month on the case, for example, Mr. Beck filed at least ten pleadings. At every turn of the road, he objected to sales of estate property, objected to settlements, demanded that property be produced for appraisal, amended objections, sought reconsideration of all orders which did not go his way, sought contempt orders and sanctions against the Trustee, etc. He also deposed the Trustee at some length. All of this "zeal" was supposedly for the benefit of Russell Glen Melenyzer. Because each pleading demanded some sort of action from the Trustee and/or his special counsel, though, these myriad filings significantly *delayed* the closing of the estate, to the apparent detriment of Russell Glen Melenyzer.[32]

---

from the bankruptcy estate and even more thinly disguised personal efforts—growing out of a long-standing animosity between Mr. Beck and Mr. Seidler—to harass and malign the Chapter 7 Trustee.

Ms. Melenyzer refuses to accept that fact that she will not, and cannot, directly share in any distribution from this bankruptcy estate because she has never filed a proof of claim against the estate. Despite her disbelief, however, the most Ms. Melenyzer can now hope for is a share of whatever money, if any, is ultimately returned to her ex-husband, Dr. Melenyzer, at the end of the case. This money, though, will not be due her as a distribution from the estate. Rather, it will be money to which she might be entitled under the terms and conditions of the state court's division of the marital estate when the Melenyzers divorced.

31. In addition to her efforts in court, Ms. Melenyzer also began "trying" this bankruptcy outside of court. First of all, she told her story to reporters who, without further investigation, reported what she told them. In these articles and in letters to the editor, Ms. Melenyzer condemned the bankruptcy system and conducted what amounted to a smear campaign against the court and the court's officers. Also, in the fall of 1991, Ms. Melenyzer participated in a demonstration in front of the courthouse, protesting the purported inequities of the bankruptcy system. Photographs of Ms. Melenyzer and other picketers appeared in the local newspapers. Mr. Beck, meanwhile, had attempted to pressure the United States Attorney into instigating a criminal investigation of Mr. Seidler, and—as discussed later in this opinion—he also insisted that the United States Trustee investigate Mr. Seidler. Both of these efforts failed for lack of merit. After that, Mr. Beck went to Washington, D.C. to testify before a congressional committee which is evaluating the United States Trustee program, using this case as one example of the United States Trustee's failure to supervise panel trustees adequately. The transcript of Mr. Beck's testimony reveals that he spent about one-third of his time telling the committee Ms. Melenyzer's version of this bankruptcy case. Most recently, Ms. Melenyzer has taken to making repeated phone calls and sending letters to the judge's chambers, in an effort to pressure the court. In keeping with this court's strict policy against ex parte contacts of any sort, Ms. Melenyzer's calls and letters have availed her nothing.

32. As the Trustee stated in his Reply to Benz' Objections:

45. Since his appearance in the case, Mr. Beck has filed objections to almost every conceivable pleading filed by the trustee or his counsel. This has caused great delay and expense to the estate. Contrary to his ill-founded allegations, it appears Mr. Beck's actions more than any other cause, resulted in the delays experienced during the later years of this case.

46. The filing of the flurry of motions and objections was but a part of an overall pattern of harassment by Mr. Beck (no matter who he

What is more, once Mr. Beck came on the scene, the tenor of the pleadings became increasingly hostile toward the Trustee. In fact, this court's October 3, 1989, order directly refers to the hostility and frivolity of Mr. Beck's behavior. As time went on, moreover, Mr. Beck's hostility began to spill over into his interactions with people other than the Trustee.[33] Still, Mr. Beck was undaunted. He sought to have Mr. Seidler removed, sued the Trustee on his bond, and insisted that the United States Trustee investigate Mr. Seidler's conduct in *all* cases in which he served as a trustee. Beck maintained that such an investigation would reveal serious improprieties and acts of misfeasance or malfeasance on Seidler's part. This effort ultimately failed for lack of merit—as the United States Trustee's July 2, 1991 Response indicated—and it wasted even more time by once again diverting the Trustee's attention from his administrative tasks.[34]

Despite these many adverse circumstances, the Trustee tried to continue administering the case, litigating his objection to the debtor's discharge and objecting to various proofs of claim.[35] As previously discussed, the debtor's discharge was denied on January 12, 1990. The Trustee's objections to the claims of Borgchild Berg, and Helen Rocha and one of the claims of George Benz were sustained in July 1991; and his objections to the claims of Humana Hospital, Linda Melenyzer, and John Patrick Lowe were sustained in mid-August 1991. In addition, the Trustee was able to obtain agreed orders determining the debtor's tax liability to the I.R.S., and he pursued litigation against Carmen Melenyzer, Tom Stolhandske, and Kevin Schleicher for their misappropriation of estate property.[36]

By mid–1991, Mr. Beck switched from representing Russell Glen Melenyzer to representing Mr. George Benz.[37] Although his client had officially changed, Mr. Beck's personal agenda of harassing the Chapter 7 Trustee and impeding the administration of this estate remained unchanged. On September 9, 1991, the Trustee filed his Final Report and Account, in an attempt to close this estate at last. Predictably, Mr. Beck, then in his new role as attorney for George Benz, filed an objection.[38] This objection

represented, if anyone at all (at times)). He has slandered the trustee on various occasions and by design misrepresented transactions by the trustee. The trustee believes that such action was motivated by Mr. Beck's long standing [sic] hatred of the trustee which apparently festered when the trustee testified at length against him in a contempt show cause hearing before the Chief Judge of the United States District Court for the Western District of Texas, where Mr. Beck's history of abuse was aired in detail.

33. In August 1990, several reports were filed with the Clerk's office, documenting Mr. Beck's violent behavior with various employees of the Clerk's office and others. Actually, the history of incidents involving Mr. Beck and either members of the clerk's office or attorneys goes back a number of years. These reports merely documented the latest series of incidents.

34. After Mr. Beck's exit from the case, Ms. Melenyzer continued to try to get back the house at 104 Cobblestone. The court heard and considered her contention that she had a homestead interest in the house, ultimately ruling against her. The decision actually gave her an opportunity to recover $6000 for her "possessory interest" in the property, provided she moved out within thirty days. This she failed to do, forfeit-

ing the money. She was ultimately evicted by the beneficiaries of the Melenyzer Trust, after an attempt to stay the order was rebuffed first by the district court, then by the Fifth Circuit.

35. The court had earlier specifically directed the Trustee to wrap up this case, in view of its age and its acrimony.

36. This litigation was necessitated by the fact that Carmen Melenyzer apparently misappropriated a $40,000 insurance check belonging to the bankruptcy estate, apparently to pay her divorce attorneys, Stolhandske and Schleicher. Though she has admitted to taking the check, she insists the Trustee let her. After the litigation was initiated, she attempted to recuse the judge, on grounds that he was prejudiced against her because of her Hispanic background. The motion was denied. Ms. Melenyzer subsequently filed her own Chapter 7 bankruptcy in the Austin division. The litigation involving the insurance check is proposed to be abandoned to the debtor.

37. He ceased representing Russell Glen Melenyzer after the suit he had filed on the Trustee's bond was dismissed for lack of standing.

38. The hearing on the objection took three days, during which Mr. Beck attempted to turn the

and all its attendant motions and wrangling—which by themselves fill several volumes of documents in this case—has managed to keep the estate open for seven additional months, to date.

### The Relevant Law

As with other types of trustees, a trustee in bankruptcy is a creature of the document or statute which creates him, and his duties do not exceed those enumerated in that document. In the case of a bankruptcy trustee, his duties and powers are established by various provisions of the Bankruptcy Code, many of which remain essentially unaltered from their predecessors in the Bankruptcy Act.[39]

The *primary* duty of a Chapter 7 Trustee is to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(1); *see also Estes & Hoyt v. Crake (In re Riverside–Linden Investment Co.),* 925 F.2d 320, 322 (9th Cir.1991); *Bunch v. Maloney,* 233 F. 967, 969 (8th Cir.1916), *rev'd on other grounds,* 246 U.S. 658, 38 S.Ct. 425, 62 L.Ed. 925 (1917) (trustee's chief duty is to make estate's assets available for benefit of general creditors' claims); *Trice v. Coolidge Banking Co.,* 242 F. 175, 175 (S.D.Ga.1917). In addition to this primary duty, the trustee shall:

(2) be accountable for all property received;

(3) ensure that the debtor shall perform his intention as specified in section 521(2)(B) of [Title 11];

(4) investigate the financial affairs of the debtor;

(5) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;

(6) if advisable, oppose the discharge of the debtor;

(7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;

(8) [inapplicable in this case]; and

(9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee.

11 U.S.C. § 704(2)–(9).

To enable the trustee to accomplish these statutory duties, the Code also gives the trustee many powers. For instance, he or she may collect accounts, institute necessary legal actions, secure any orders necessary to make the debtor or others turn over estate property, sell real and personal property of the estate, assume or reject executory contracts, set aside fraudulent or preferential transfers of property, avoid liens, and submit claims to arbitration. These powers and the duties enumerated in Sections 704(2)–(9), however, " 'are merely directory as to what the trustee shall do in accomplishing the main object and purpose of the appointment,' " as set out in Section 704(1). 4 *Collier on Bankruptcy* 704.-01[3], at 704–5 (15th ed. 1992).

■ A bankruptcy trustee is a fiduciary of the estate's creditors, and his duty to collect and "conserve the assets of the estate and to maximize distribution to creditors" is a fiduciary obligation. *See, e.g., United States v. Aldrich (In re Rigden),* 795 F.2d 727, 730–31 (9th Cir.1986) (citing *In re Benny,* 29 B.R. 754, 860 (Bankr. N.D.Cal.1983) for the same proposition). Therefore, like any other fiduciary, bankruptcy trustees must act with reasonable care and due diligence in discharging any of their statutory duties.[40] *See id.* While

matter into an inquisition over the Trustee's conduct as trustee in *all* of his cases. The court ruled evidence of these extraneous matters inadmissible.

**39.** For example, 11 U.S.C. § 704(1) is virtually identical to § 47(a)(1) of the Act, except that the Act provision required trustees to carry out their duties "under the direction of the court." Similarly, § 704(5) of the Code is essentially the same as § 47(a)(8) of the Act, and Code §§ 704(6) and (7) are very similar to Act §§ 47(a)(9) and (10), respectively. In short, many of the statutory duties currently imposed upon bankruptcy trustees actually pre-date the Code.

**40.** In this respect, bankruptcy trustees are much like executors and administrators of probate estates, or any other sort of trustee.

a trustee will not be held liable for errors in judgment in matters where discretion is permitted, he or she may be held liable for both negligent and intentional violations of the duties imposed upon him by law. *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357 (9th Cir.1983). Thus, for example, a trustee "may be charged with the value of assets which never came into his possession, if he fails in his duty to get them into his possession." *Pueblo Savs. & Trust Co. v. Power (In re Power)*, 115 F.2d 69, 72 (7th Cir.1940).

■ Often a bankruptcy trustee's duties seem to conflict with one another. On the one hand, the trustee has a duty to close the estate as expeditiously as is compatible with the best interests of parties in interest. On the other hand, the trustee must also collect the assets of the estate; investigate the financial affairs of the debtor; and appropriately object to the debtor's discharge, to proofs of claim, or to exemptions. In this case, the Trustee performed all of these duties. He successfully objected to (1) some of the debtor's exemptions, (2) the debtor's discharge, and (3) several improper proofs of claim. In addition, he also ferreted out substantial amounts of concealed assets, turning what appeared to be a no-asset estate into a solvent estate. By itself, any one of these duties is time-consuming, but when—as here—the trustee must perform all of them, the total amount of time required to close the case increases substantially. Certainly, the trustee does not have an obligation to investigate every matter which is brought to his or her attention, no matter how frivolous. But neither can the trustee ignore outright charges of concealing assets, fraudulent conduct, or other wrongdoing by the debtor, such as were made in this case.

■ Balancing these apparently competing duties is all the more difficult because the trustee must make decisions prospectively, without the benefit of hindsight, and it is always much harder to guess than to second-guess.[41] Thus, a court reviewing the trustee's administration of a particular case should attempt to reconstruct the case from the trustee's perspective, evaluating the reasonableness of the trustee's decisions in light of the information that was, or reasonably should have been, available to him or her at the time. The standard, after all, is "reasonable care" and "due diligence," not perfection. *In re Rigden*, 795 F.2d at 730–31. Trustees should not be punished, after the fact, for judgment calls which, at the time they were made, seemed reasonable. *See In re Cochise College Park, Inc.*, 703 F.2d at 1357; *In re Sapphire S.S. Lines, Inc.*, 509 F.2d 1242, 1245 (2d Cir.1975). Adopting such a "gotcha" policy would, in the long run, do more to jeopardize than to encourage the efficient administration of bankruptcies by making trustees unduly tentative about every decision and action they take. We are not saying that trustees' behavior should be beyond review. Rather, we are saying that, as much as possible, a reviewing court should try to put itself into the trustee's shoes and evaluate the trustee's decisions accordingly. If that means that a court must "reconstruct" a case, pleading by pleading, then so be it.

At the hearings on Creditor Benz' Objection to the Trustee's Final Report and Accounting, Mr. Beck argued that the Trustee could and should have collected just enough money to pay the proper claims, and then he should have objected to the improper claims and distributed the estate. Had the trustee done that, Beck maintains, the estate could have been closed much sooner. Mr. Beck's argument is flawed in many ways. First, the trustee is required to "assume possession of or exercise control over *all known* assets of the estate," not "just enough" assets of the estate. *Handbook for Chapter 7 Trustees* 20

---

**41.** Nevertheless, "if a trustee bears in mind that he is the representative of the estate considered as a whole, is bound to be vigilant and attentive in advancing its interests, and is under obligation to seek to carry out in the strictest good faith the provisions of the Bankruptcy Act [Code] where they seem to apply plainly to the estate committed to his charge, he is not likely to go far wrong in doing, or in refusing to do, what may be asked of him by the creditors." *In re Baird*, 112 F. 960 (D.C.Pa.1902).

(1992). In this case, "all known assets" included the concealed assets and the bogus trust, as well as the debtor's fraudulent conveyances, all of which were made known to the Trustee by none other than Carmen Melenyzer.

 It is true that the *Handbook for Chapter 7 Trustees* directs trustees to begin the claims review process "after it is certain that there will be a distribution to creditors and as soon as possible following the expiration of the bar date for filing claims." *Handbook for Chapter 7 Trustees* 59 (1992). In this case, however, there was pending litigation which, if successful, promised to increase the distribution to creditors substantially. There was also asserted liability by the Internal Revenue Service which would have substantially reduced the distribution to creditors.[42] Viewing the case from the standpoint of the Trustee at the time, we cannot find that the Trustee was in any way negligent in holding off on filing claims objections until these other matters were resolved, especially in light of the prime directive to realize from the estate all that is possible for distribution among creditors. *Freeman v. Seligson*, 405 F.2d 1326, 1333 (D.C.Cir.1968); *Commercial Credit Corp. v. Skutt*, 341 F.2d 177, 181 (10th Cir.1968); *In re Kessler & Co.*, 186 F. 127, 130 (2d Cir.1911), *aff'd sub nom.*, *Merchants Nat'l Bank v. Sexton*, 228 U.S. 634, 33 S.Ct. 725, 57 L.Ed. 998 (1912). A trustee bears liability for the value of any assets which he fails to bring into the estate, if such failure

constitutes a breach of his duty to collect the assets of the estate. *In re Power*, 115 F.2d at 72; *see also Handbook for Chapter 7 Trustees* 20 (1992). Since this case began as a no-asset estate, but ended with a solvent estate, had the Trustee decided to quit looking for and collecting assets prematurely, the Trustee would not have been fulfilling his statutory duties. *See In re Johnson*, 518 F.2d 246, 251 (10th Cir.1975); *see also In re Kessler & Co.*, 186 F. at 130.[43]

Even if Mr. Beck's argument were valid—which it is not—where does one draw the line in deciding how many assets are "just enough," such that any continued efforts to collect assets becomes unwarranted? The Ninth Circuit offers some guidance on this issue by condemning churning by a bankruptcy trustee and stating that a trustee's actions become unwarranted when the *only* parties benefitting from such actions are the trustee and his professionals. *In re Riverside–Linden*, 925 F.2d at 322 (emphasis added). The case at bar, unlike *Riverside–Linden* and despite Mr. Beck's allegations, is not a churning case, however. From what was initially a no-asset estate, the creditors will ultimately be paid in full, with interest. Clearly, the Trustee and his professionals were not the *only* parties who benefitted from the Trustee's efforts.

The mere suggestion that Mr. Seidler intentionally kept this bankruptcy case open, so that he and his professionals could milk it dry, strains credulity. The fees paid and requested by Mr. Seidler, Mr. Wilkins,

**42.** The claim of the Internal Revenue Service was a priority claim. Mr. Beck points out that the claim was untimely filed, so that it should not have affected the distribution. This is not correct, however. Even a late-filed claim gets to participate in the distribution of estate assets, albeit not as a priority claimant. 11 U.S.C. § 726(a)(3). The Internal Revenue Service, as much as any other creditor, was entitled to payment out of estate assets, to the extent they were otherwise available, lending further credence to the Trustee's efforts to obtain enough property to pay all creditors in full.

**43.** The *Johnson* case discusses the level of care which a trustee must exercise in his administration of the case:

The standard or measure of care, diligence, and skill is that of an ordinarily prudent man

in the conduct of his private affairs under similar circumstances and with a similar object in view.

*Id.* *Johnson* is a surcharge case, discussing the circumstances in which a surcharge against the trustee might be appropriate. The standard for assessing a surcharge is negligence. There, a trustee was surcharged for losses to the estate resulting from defalcations by the estate's bookkeeper. *Id.* at 248. Applying the foregoing standard to the facts of this case, we do not find that the Trustee was negligent, especially given the circumstances in which the Trustee was constrained to operate. *See Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951) (trustee found negligent for allowing key employees to profit personally by trading in securities of the estate's subsidiaries).

and Mr. Calhoun are neither out of line, nor have they exhausted the assets of the estate. Besides, given the undesirability of this case, no trustee in his right mind would have intentionally kept it open one day longer than necessary. Finally, many of the fees about which Mr. Beck now complains are the direct result of Mr. Beck's own filings of multiple, frivolous pleadings. Regardless of whom he now represents, Mr. Beck cannot convincingly seek redress for an injury which, if it exists at all, he himself caused.

■ We do *not* hold that the Trustee administered this case without error. Questions were raised about the Trustee's failing to keep assets in an interest-bearing account for a period of time, for example, and his failure to sell assets as quickly as he otherwise might have after the Melenyzer Trust settlement was at long last finalized.[44] He also hired an accountant who was his client, a practice of which this court does not approve (and the Trustee was instructed to cease such practices immediately, which he has). And while the Trustee's failure to object to claims earlier in the case was not negligent within the meaning of the case law, he should indeed have initiated the claims objections process earlier in this case, a step which might have (though not necessarily, in view of the true issues which have kept this case open) foreshortened the time this case has been pending. The appropriate remedy for these actions is to reduce the trustee's commission, which will be cut from 3% to 1.5% of the monies disbursed. 11 U.S.C. § 326(a).

■ The suggestion that the Trustee should be surcharged for negligence in his administration of the estate is, on the other hand, without foundation. *See In re Johnson*, 518 F.2d at 251. Given the circumstances of this case, the evidence does not warrant a finding that the Trustee caused a loss to the estate by his failure to exercise the care, diligence, or skill of an ordinarily prudent man in the conduct of the case. If anything, an ordinarily prudent man would not even *be* a trustee if he knew that he would have to operate under the conditions this case has imposed. Given the full payment to unsecured creditors, including Benz, there is no evidence of a loss to the estate upon which to premise a surcharge in any event.

## CONCLUSION

■ In conclusion, the court finds that the Trustee did not breach any of his statutory duties in this case. That is not to say that the Trustee executed his duties flawlessly, but then perfection is not the standard. Prospective, pleading-by-pleading review reveals that, from the outset, this bankruptcy has been fraught with difficulty, generated primarily by the difficult people involved. There have been questions about: (1) the debtor's honesty; (2) the accuracy of the debtor's schedules; (3) hidden assets; (4) fraudulent transfers; (5) a bogus trust; and (6) a very angry ex-wife. Subsequent to filing bankruptcy, the debtor, Dr. Charles Melenyzer, became a fugitive from justice, was convicted of a felony, and served time in the state penitentiary. As the foregoing chronology also indicates, the debtor's ex-wife, Carmen Melenyzer, despite the fact that she never filed a proof of claim against the estate, has persistently barraged the court with pleadings and protests, trying somehow to gain access to estate assets, to which she firmly believes she is entitled as an ex-wife.[45] Mostly, however, her efforts have only succeeded in exposing her own misconceptions about, and distortions of, justice under both bankruptcy and state law.

---

**44.** The settlement was delayed for over a year by the flurry of litigation initiated by Mr. Beck.

**45.** Ms. Melenyzer erroneously believes she is entitled to estate assets pursuant to the state court's divorce decree, property division, and child support order. Simply put, under the Supremacy Clause of the United States Constitution, the Bankruptcy Code (federal law) preempts state divorce law. Consequently, property divisions ordered by state divorce courts *post-petition* are trumped by the interests of a bankruptcy estate's creditors whose rights to estate property are created and governed by the Code. This fact is particularly compelling in this case because, as the Trustee repeatedly pointed out to Ms. Melenyzer, the text of the state court order itself made the property division *subject to* the interests of the creditors of the bankruptcy estate. As for child support ordered post-petition, this was *always* the obligation of Dr. Melenyzer and *not* of the Trustee.

# 158

What is more, Ms. Melenyzer has enlisted the aid of others, such as attorney Lawrence Beck. Mr. Beck has been attorney to at least two parties in this case, most recently Creditor George Benz, whose Objection to the Trustee's Final Report and Accounting is now before the court. The involvement of Mr. Beck in this case has been particularly unfortunate, moreover, because he has used and abused this bankruptcy to vent his well-documented personal animosity toward the Chapter 7 Trustee, making it all the more difficult for the Trustee to administer the case.

Over the course of several years, Ms. Melenyzer and Mr. Beck have repeatedly obstructed the administration of this case, and the case records demonstrate that this bankruptcy would undoubtedly have been closed long ago, but for the actions and tactics of Mr. Lawrence Beck and Ms. Carmen Melenyzer. It is ironic, indeed, that Mr. Beck—in his latest role as attorney to George Benz—now seeks to surcharge the Trustee for failure to administer this estate expeditiously. In essence, the very same people who have constantly interposed their own personal agendas above the interests of the estate are now asking the court to reward their disruptive behavior by surcharging the Trustee, and by requiring him, his special counsel, and his accountant to disgorge previously awarded fees. This we decline to do.

We do, however, find merit in Creditor Benz' argument that he is entitled to post-petition interest on his claim, given the fact that a balance of $129,330.00 will remain on hand after all claims and expenses have been paid. While the general rule in bankruptcy is that unsecured creditors, such as Mr. Benz, are not entitled to post-petition interest upon their allowable claims, an exception to this rule is found in 11 U.S.C. § 726(a)(5). *See, e.g., Thompson v. Kentucky Lumber Co. (In re Kentucky Lumber Co.)*, 860 F.2d 674, 676 (6th Cir. 1988). The purpose of this section is to prevent debtors from abusing the bankruptcy process by using it to delay payments and avoid interest obligations when, as here, the debtor is actually solvent. *See id.* Further, as earlier indicated, it is appropriate to reduce the trustee's commission in this case from the maximum 3% to 1.5%.

Accordingly, George Benz' objection to the Trustee's Final Report and Account is sustained to the extent that it seeks payment of post-petition interest on Mr. Benz' claim. It is further sustained with respect to the reduction in the Trustee's commission. The Objection is overruled in all other respects. Furthermore, the Trustee's First Amended Final Report and Account is hereby approved, contingent upon his making appropriate modifications to provide post-petition interest payments to all creditors, including Mr. Benz, and to reduce the Trustee's commission as herein indicated.[46]

So ORDERED.

---

The automatic stay never prevented Ms. Melenyzer from pursuing Dr. Melenyzer for payment. 11 U.S.C. § 362(b)(2). For some unknown reason, though, she never exercised that option.

**46.** The court has, by separate order, ruled on the final fee application of James Wilkins, attorney for the Trustee. The fees awarded per that order are to be provided for in the Final Report.