## In re CHICAGO ART GLASS, INC., Debtor.

### Bankruptcy No. 88 B 02810.

United States Bankruptcy Court, N.D. Illinois, E.D.

April 12, 1993.

present here. Rather, the court merely finds that no benefit was received under this particular factual scenario.

Mark Naughton, Rudnick & Wolfe, Chicago, IL, Representing Trustee.

Benjamin Norris, Dept. of Justice, Washington, DC, Representing U.S.

## MEMORANDUM OPINION

DAVID H. COAR, Bankruptcy Judge.

This Matter comes before the Court on the United States' Objection to amounts set forth in the Trustee's Application for the payment of commissions and the reimbursement of expenses incurred by Capital Liquidators, Inc. ("Capital") in the auctions conducted by Capital on behalf of Chicago Art Glass, Inc. ("Debtor"). The Court, having reviewed the memoranda of law submitted by the parties, the depositions and evidence presented, along with the applicable law, now issues Findings of Fact and Conclusions of Law pursuant to Rule 7052.

## FINDINGS OF FACT

Chicago Art Glass, Inc. commenced bankruptcy proceedings by filing its voluntary petition for relief under Chapter 7 of the Code on February 23, 1988. The Trustee, Leroy G. Inskeep, ("Trustee") was appointed on or about February 25, 1988. Prior to the bankruptcy filing, the owner of Chicago Art Glass, John Metropulos ("Metropulos") had several meetings in the Fall of 1987, with Raymond and Debra Selk ("the Selks") regarding their possible purchase of all or most of the Chicago Art Glass assets. The Selks were interested in purchasing the major glass production equipment of Chicago Art Glass, the Company's customer lists, and, in particular, the colored glass formulas, along with the glass and metal moulds used to form the glass art and jewel objects that were unique to the Chicago Art Glass product line. Although Metropulos indicated his asking price for the Company was $100,000, at no time during these discussions did Metropulos provide the Selks with an inventory of the assets of Chicago Art Glass that were actually for sale. Additionally, Metropulos vacillated on whether the moulds would be a part of the sale or, if they were, which particular moulds would be included in the purchase price.

At a December meeting which included the Selks' accountant, Mr. Selk made his own written inventory of the larger equipment which Metropulos claimed would be part of the purchase. Because of the large number of moulds stored at the factory plus Metropulos' equivocation regarding the moulds, Selk did not list the number or types of moulds that were in storage at the time of that meeting. At a later meeting prior to the bankruptcy filing, Metropulos indicated to the Selks that he wanted to sell "everything". A purchase agreement which also included an inventory list compiled by the Selks was submitted to Metropulos prior to the bankruptcy filing but it was never signed. Additionally, the Selks noted that with each subsequent visit to the Chicago Art Glass facility between December of 1987 and February of 1988, they discerned what appeared to be the gradual removal of the Company's manufacturing equipment and, in particular, the moulds. At no time during this period did Metropulos drop his asking price of $100,000 even though the Company's physical assets continued to disappear from the Chicago Art Glass factory.

The Selks and Metropulos failed to arrive at an agreement and Metropulos caused Chicago Art Glass to file for relief in bankruptcy in February of 1988. Although the Selks tendered an offer to purchase the Company's assets immediately following the bankruptcy filing, this purchase was objected to by one of the creditors and a subsequent court order dated April 13, 1988, authorized an auction sale of the assets of Chicago Art Glass. The auction was to be conducted on May 17, 1988, and Capital Liquidators, Inc., was to carry out the advertising, promotion, proper handling and sale of the Chicago Art Glass assets.

In preparation for the auction, Capital inventoried and tagged all of the items that were for sale. The inventory list was used

to create a brochure that was mailed to prospective customers. This brochure and the advertisements placed in the Chicago Tribune constituted Capital's primary methods of generating interest in the auction. On May 16, 1988, the Chicago Art Glass facility was made available for a pre-auction inspection. The Selks did not inspect the items to be sold at this time. Instead, the Selks waited until the day of the auction to tour the factory and its premises to note what was to be available for sale. One of the items which the Selks had expected to be sold at auction was an International van which had been on the premises but was missing the day of the auction. Wallace Lieberman, ("Lieberman") the auctioneer, represented that although the Internal Revenue Service had removed the van, it would still be available for sale at the auction.

The auction commenced with Lieberman announcing that there were no warranties or guarantees as to the accuracy of Capital's advertising. Additionally, all of the lots for sale were to be offered first in bulk and then later by individual lots. Lieberman would use his discretion to determine which method of sale would bring the most for the bankruptcy estate. The Selks made the highest bulk bid in the total amount of $66,112.50. The second highest bid was by Lieberman's son-in-law. After the bulk bidding, the individual lots were auctioned. During the course of bidding on the lots, the bidders requested the opportunity to inspect the lots but Lieberman refused. Not all of the items in the lots were tagged and there was no catalog listing the individual items located in each lot. After the lot bidding ceased, Lieberman indicated that the bulk bid was higher than the total of the lot bids and that, therefore, the bulk bid would be accepted. Thus, the Selks became the successful bidders. After the auction, the Selks tendered a check in the amount of $66,112.50. At the time the check was tendered, the Selks reminded Lieberman that the International van was to be included as part of the purchase. Lieberman represented that he would retrieve the truck from the IRS and would make sure the Selks obtained possession of the van. Additionally, the Selks requested both a receipt and a bill of sale from Lieberman.

The check the Selks tendered to Capital for the auction sale did not clear their bank. The reasons were twofold: first, the Selks' financing fell through; and, second, their bank refused to honor the check because the Selks told the bank that several items that they thought they had purchased were now missing. One of these items was the van. When the Selks notified Lieberman that the check they had tendered would not be honored, Lieberman suggested that the Selks try to come up with a down payment. Subsequently, the Selks deposited $18,000.00 with the Trustee as the down payment on their purchase.

Two to three weeks after the auction, the Selks returned to the Chicago Art Glass factory, and found that a number of items which were present on the day of the auction were now missing. The Selks also discovered that the locks to the Chicago Art Glass factory had never been changed by either the Trustee or the owner. Thus, anyone who had a key to the premises prepetition had access to the building during and after the auction. The Selks determined that many of the items which they believed they purchased at auction were later removed. Indeed, several weeks after the auction, Metropulos attempted to sell Mr. Selk moulds which were located in the garage of his home. Many of the moulds offered by Metropulos were on view on the day of the auction. Because of this, the Selks refused to pay the balance owed on their auction purchase. The Selks notified the Trustee and Lieberman orally and in writing that their only interest was in obtaining the items which they believed they had purchased. Lieberman's response to the Selks' refusal to remit the balance owed on the sale was abusive language and threats of physical violence. Incredibly, the Trustee responded by refusing to discuss the matter with the Selks. The Trustee directed the Selks to "discuss it with the auctioneer". On November 21, 1989, the Trustee filed an adversary complaint (case number 89 A 1040) to recover the balance

of the amount bid at the auction and attorneys' fees from the Selks.

Prior to the Trustee's action against the Selks, there also arose questions over the ownership of moulds which had been removed from the Chicago Art Glass factory and loaded on trailers which were seized and held by the IRS. The property located on these trailers consisted of glass moulds purchased from the bankruptcy estate of the Roderer–Gleason Company. On June 16, 1989, Metropulos initiated an adversary proceeding (case number 89 A 567) against, *inter alia,* the Trustee to determine the ownership of this property. Raymond and Debra Selk were also intervenor complainants in this adversary proceeding. The Selks believed that many of the moulds that were located on the trailers were part of the Chicago Art Glass assets which they had purchased at the May 17, 1988, auction. This Court held an evidentiary hearing in the adversary proceeding and on October 6, 1989, determined that the moulds were the debtor's property. Additionally, a third trailer with moulds was also located at Ron Nunnes Trucking in Crystal Lake, Illinois.

On or about April 24, 1990, the Trustee presented a motion to approve a compromise of the controversy with the Selks, whereby the Selks would pay the Trustee $50,000.00 and the Trustee would convey title to the moulds to the Selks. The United States filed a written objection to the proposed settlement with the Selks and voiced its objection at a hearing on the proposed settlement. One of the objections raised by the United States was that there was no way, short of an auction, to determine the value of the moulds. The Trustee, in turn, suggested in writing to the United States that it take the lead in coordinating the second auction for the moulds. However, the United States declined and the Trustee then made arrangements for Capital Liquidators to advertise and handle the sale of the moulds at a second auction.

On or about August 28, 1990, the Trustee presented a motion to approve a second compromise with the Selks whereby, *inter alia,* the Trustee would hold a public sale of the moulds. On September 26, 1990, this Court entered an Agreed Order approving the settlement between the Trustee, the Selks, and the United States. On or about April 4, 1991, the Trustee filed an application to retain Capital as auctioneer to conduct an auction on the moulds. On April 19, 1991, this Court entered an order approving the Trustee's retention of Capital to conduct the second auction. On May 24, 1991, Capital held a second auction of the moulds. The Trustee filed an application on May 30, 1991, seeking the Court's authority to pay Capital a commission of $4,230.00 for both auctions and to reimburse Capital $10,925.18 for expenses incurred in connection with both auctions. The following is the breakdown of Capital's total costs and expenses related to both auctions.

### FIRST AUCTION

| | | |
|---|---|---|
| a. | $2,800.00 | labor |
| b. | 158.25 | postage |
| c. | 2,000.00 | advertising |
| d. | 130.00 | copying & printing |
| e. | 110.00 | towing |

$5,198.85

### SECOND AUCTION

| | | |
|---|---|---|
| a. | $ 483.84 | advertising |
| b. | 179.36 | copying & printing |
| c. | 100.00 | typesetting |
| d. | 503.15 | postage |
| e. | 245.00 | towing |
| f. | 665.00 | forklift |
| g. | 90.00 | packing labels |
| h. | 3,460.00 | labor |

$5,726.35

In addition to reimbursement of the above expenses, Capital also seeks commission of $4,230.00, calculated as 8% of the gross sales proceeds from the two auctions.

The United States objects to the payment of those expenses for the first auction which exceed the $500.00 ceiling stipulated in the first Court order authorizing that auction and the United States also objects to the payment of all of the expenses incurred by Capital in the second auction. The United States does not object to the payment of Capital's commissions earned by the sales in both auctions ($4,230.00) and it also does not object to the payment of Capital's expenses incurred in the first auction. This would be the $500.00 as ordered along with advertising and publicizing expenses associated with the first auction. ($2,788.85).

### CONCLUSIONS OF LAW

The starting point to any request for compensation or reimbursement of expenses for professionals is 11 U.S.C. §§ 330(a)(1) and (2) which provide:

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person or attorney, as the case may be, based on the nature, extent, and the value of such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

 Section 330 allows for compensation and the reimbursement of expenses which are determined according to a standard of reasonableness. 2 Collier on Bankr. ¶ 330—06[1] (15th ed. 1989). In allowing expenses to be paid from the estate, the Court must consider whether the expenses benefitted the estate. *Id.* Additionally, a bankruptcy court has an obligation to ensure that professional services provided to an estate adhere to a standard of integrity. "The administration of a bankruptcy case, is not, **sui generis**, necessarily adversarial, as the processes, priorities and duties of the parties are clearly set forth in the Bankruptcy Code." *In re Sky Valley, Inc.*, 135 B.R. 925, 933 (Bkrtcy. N.D.Ga.1992). The obligations of a debtor, and professionals employed by the debtor are necessarily fiduciary. *Id.* "Unless those fiduciary duties are fulfilled, the bankruptcy process appears to creditors and the public to be tainted by self-interest, abuse of the bankruptcy process, or even fraud." *Id.* Thus, it is the duty of the bankruptcy court, "with the assistance of the U.S. Trustee, to monitor the conduct of the debtor and the professionals he employs to assure fidelity not only to the express requirements of the Bankruptcy Code but also to the policies which underlie such requirements." *Id.* In the instant case, the Trustee bore the responsibility of selecting the professional that would serve the estate. In this case, Capital Liquidators was given the task of providing auction services to effectively liquidate the assets of Chicago Art Glass. Unfortunately, what followed does not reflect reflect well on the sale process—a process that is fundamental to the efficacy and integrity of the Bankruptcy Code.

 The Trustee maintains that the United States fails to assert that Capital's expenses were unreasonable. Thus, the Trustee requests the Court to look to the merits of Capital's expenses to determine their allowability based on reasonableness. However, the determination of reasonableness by a bankruptcy court in the payment of professional fees is inextricably tied to the court's discretion. "Generally, the

Bankruptcy Court has broad discretion to deny professional fees." *In re Rheam of Indiana*, 142 B.R. 698, 700 (Bkrtcy.E.D.Pa. 1992). Additionally, although sec. 328(a) allows the bankruptcy court substantial discretion in altering a fee agreement when the circumstances warrant, "absent evidence of any 'unanticipated developments' that justify such a departure, the court may not award compensation different from that in the order authorizing employment." *In re Cal Farm Supply Co.*, 110 B.R. 461, 465 (Bkrtcy.E.D.Cal.1989); *citing: In re Confections by Sandra, Inc.*, 83 B.R. 729 (Bkrtcy. 9th Cir.1987). Even though the *Cal Farm* Court noted that it is arguable that sec. 328(a) applies only in those cases involving limitations on fees or compensation, *Cal Farm* held "that limitations on the reimbursement of *expenses are not* subject to the standard articulated in the *Confections* case." (emphasis added) *Cal Farm*, at 465. Thus, *Cal Farm* stands for the denial of the reimbursement for those expenses that "are customarily not compensated since they constitute ordinary overhead." *Id.* This Circuit has not taken a definitive stand on the question of whether certain auction expenditures constitute ordinary overhead, and it is unnecessary for us to reach that issue of first impression here.

The *Cal Farm* Court also noted that "[i]f a professional was permitted to perform his services and subsequently seek reimbursement for any and all expenses without any kind of court review, the effect of such a practice would be to give the professional carte blanche status with the court." *Id.* Insofar as the first auction is concerned, the Trustee and Capital were on notice from the Court Order dated April 13, 1988, that the "expenses incurred by Capital for which it will seek reimbursement from the Estate shall not exceed $500. This ceiling on expenses shall not apply to any advertising expenses." However, Capital seeks reimbursement of expenses that greatly exceed the authorized amount. These unauthorized expenditures reflect Capital's "free rein" approach to its expenses.

Further, the bankruptcy system is premised on the Fourteenth Amendment Due Process principles of notice. The type of notice required is described in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). "[N]otice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Sky Valley*, at 933; *citing: Mullane.* Additionally, the "bankruptcy process itself provides a mechanism which by its nature abhors secrecy: similarly, bankruptcy abhors undisclosed payments and expenditures." *Id.* at 933. Here, the Trustee submitted an application for the reimbursement of expenses which was hundreds of dollars over the authorized amount *after* the expenditures and payment commitments were made. The Bankruptcy Court should have been properly notified by the Trustee that such expenditures were reasonably anticipated. Proper notice would have given the Court an opportunity to reevaluate its authorized order on the issue of expenses.

The United States argues that Capital's mishandling of the first auction materially contributed to the necessity for holding the second auction. The Record is not clear as to the degree to which Capital's misconduct before and after the first auction might have contributed to the subsequent need for a second auction. Further, the Record does not adequately reflect where the lines of responsibility were drawn between the auctioneer and the Trustee in the handling of the debtor's assets both before and after the first auction. As between the auction company and the Trustee, it is not at all clear who bears the primary responsibility for failing to fully protect the assets of Chicago Art Glass prior to and after the first auction. What is evident, however, is that actions by Lieberman on behalf of Capital along with the refusal by the Trustee to take affirmative steps to safeguard the debtor's assets substantially contributed to the need for a second auction. Both Capital and the Trustee share responsibility for the dispute with the Selks. The actions or inaction by both the Trustee and Capital

regarding the debtor's assets negated an effective judicial sale which may have also deprived the Selks of the full benefit of their bargain. "The necessity for maintaining confidence in the stability of judicial sales is beyond dispute." *Hungerford v. Owen Magnetic Motor Car Corporation*, 277 F. 244 (District Court, D.Delaware, 1921).

First and foremost, the Trustee has a legal duty and obligation to preserve the assets of the debtor's estate. Section 704 of the Bankruptcy Code outlines those duties. Specifically, § 704(2) provides:

The Trustee shall—

(2) be accountable for all property received;

In this regard, trustees are bound to use due diligence in the discharge of their duty to "collect and reduce to money the property of the estates for which they are trustees" and to secure possession of all the debtor's property and collect all debts. *Collier*, at ¶ 704.04, p. 704–8 & 9; *quoting, In re Modern Dairy Farms No. 1*, 19 B.R. 322 (Bkrtcy.M.D.Fla.1982). Incidental to these duties is the obligation of the trustee to "carefully preserve the assets in his possession, upon pain of surcharge[1], from deterioration or dissipation." *Collier*, at 704–9; *See also: In Chappel v. First Trust Co. of Wisconsin*, 30 F.Supp. 765 (E.D.Wis.1940). Thus, a trustee has been held accountable for losses suffered when assets were appropriated by an auctioneer who had been placed in charge of the debtor's retail operation. *Carson, Pirie, Scott & Co. v. Turner*, 61 F.2d 693 (6th Cir.1932). A trustee has also been held liable for negligence for losses suffered by an estate "as the result of embezzlement by a bookkeeper when the trustee failed to supervise the bookkeeper, failed to check on the bookkeeper's work and consequently never discovered the losses." *Collier*, at 704–10; *quoting, In the Matter of Roy M. Johnson*, 4 C.B.C. 545 (1975).

The basis for imposing liability on a trustee who improperly administers a bankruptcy estate is found in the trustee's status as fiduciary. "A bankruptcy trustee is a fiduciary of the estate's creditors, and his duty to collect and 'conserve the assets of the estate and to maximize distribution to creditors' is a fiduciary obligation." *In re Melenyzer*, 140 B.R. 143 (Bkrtcy. W.D.Tex.1992); *Also: United States v. Aldrich (In re Rigden)*, 795 F.2d 727, 730–31 (9th Cir.1986); *citing: In re Benny*, 29 B.R. 754, 860 (Bankr.N.D.Cal.1983). Therefore, bankruptcy trustees must act with reasonable care in discharging their statutory duties. *Melenyzer*, at 154. Although a trustee will not be liable for misjudgments in matters where discretion is allowed, "he or she may be held liable for both negligent and intentional violations of the duties imposed upon him by law." *Id.*, at 155; *In re Cochise College Park, Inc*, 703 F.2d 1339, 1357 (9th Cir.1983). Further, even though the trustee has no obli-

---

1. On the issue of surcharging a trustee as a penalty for failing to properly administer a bankrupt estate, courts have been split over whether the surcharge penalty should arise from a trustee's personal liability for negligent actions versus deliberate or wilful conduct. The decisional split has arisen from an interpretation of *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951). Some line of cases, have followed an interpretation of *Mosser* that hold that a "trustee is personally liable only for acts determined to be willfully and deliberately in violation of his duties, and liable in his official capacity only for acts of negligence." *In re Reich*, 54 B.R. 995 (Bkrtcy.E.D.Mich.1985); *citing: Sherr v. Winkler*, 552 F.2d 1367 (10th Cir.1977); *Also: In re Johnson*, 518 F.2d 246 (10th Cir.), cert. denied, sub. nom. *Clark v. Johnson*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975). Under this interpretation, a surcharge would attach only if a Trustee's actions have been wilful or deliberate. And, these courts have made a distinction between a trustee's personal liability and his "official" liability. However, other courts have determined that *Mosser's* holding has a broader reach regarding a trustee's personal liability. The *Reich* Court concluded that *personal liability* will arise for a trustee for negligent as well as wilful or deliberate actions against the bankrupt's estate. In citing *Mosser*, the *Reich* court noted, "[t]here is no question that a trustee in bankruptcy may be held personally liable for breach of his fiduciary duties. Such liability may attach as the result of negligent, as well as knowing or intentional, breaches." *Reich*, at 1001; *quoting: Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951); *Also: In re Cochise College Park, Inc.*, 703 F.2d 1339 (9th Cir.1983).

gation to investigate every matter that is brought to his or her attention, the trustee is statutorily required to look into charges of the concealment of assets, fraudulent conduct, and any other wrongdoing by the debtor or other third parties. *Melenyzer*, at 155.

The Selks believed that they were purchasing one group of items at the auction, however, after the auction, many of the things they thought they had purchased disappeared. Under the circumstances it cannot be said that their belief was unreasonable. Other items, which they were told they could purchase, may not have really been included in the sale because the IRS had a lien interest in them. The Selks contacted both the Trustee and Lieberman verbally and in writing expressing their concerns. Further, the Selks found that with each subsequent visit to the warehouse, additional assets were gone. Yet, the Record indicates that the Trustee *did nothing* to verify the Selks' charges and took no action to retrieve any of the assets which were misappropriated. Like Pilate, the Trustee washed his hands of the dispute.

Any assets which were missing, whether purchased by the Selks or otherwise, were the responsibility of the Trustee. The Trustee had an affirmative duty to track those items down. Until full payment was received from the Selks, the "purchased" items were still assets of the estate. A trustee is required to "assume possession or exercise control over *all known* assets of the estate." *Id.; citing:* Handbook for Chapter 7 Trustees 20 (1992). Further, a trustee has a duty to preserve estate assets. *In re Reich*, at 1002; *Rife v. Ruble*, 107 F.2d 84 (6th Cir.1939); *Carson, Pirie, Scott & Co. v. Turner, supra*. This duty to preserve assets would also include any assets that are known or have been brought to the trustee's attention as misappropriated. The failure of a trustee to not affirmatively act upon learning of such misappropriation is negligence. *Carson*, at 694. A trustee's failure to investigate such a matter is a breach of his or her fiduciary duty to the estate.

The first auction was handled in a haphazard manner which fell far below the requirements of fair notice and proper dealing. There was no precise listing or catalog of the assets which were up for auction. Items to be auctioned in lots were not clearly tagged or otherwise identified. Prospective buyers who requested to inspect such lots were flatly refused the opportunity to do so. In particular, the International van, which had been seized by the Internal Revenue Service, was represented by Lieberman as one of the items available for sale. In fact, ownership of the van and its contents was disputed and this was not made known to prospective purchasers. The Selks reasonably relied on Lieberman's representations, and assumed at some point during the auction that they had indeed purchased the van. Additionally, several of the assets which were listed on the Selks' bill of sale were not present or physically accounted for on the day of the auction. Certain of these items were never received by the Selks. Although buyers at auctions have a responsibility to investigate the quantity of the goods they are buying, where a buyer at an auction has been induced to buy through fraudulent representations, the buyer may rescind the sale or bring an action for damages. *Gould v. Hiram Walker & Sons*, 142 F.2d 544 (7th Cir.1944); *Dayton v. Kidder*, 105 Ill.App. 107 (1902).

The Court, therefore, concludes that the poor handling of the first auction by Lieberman on behalf of Capital along with the failure of the Trustee to supervise the conduct of the auctioneer and protect the assets of the Chicago Art Glass bankruptcy estate after the first auction ultimately led to the dispute between the Selks and the Trustee.

Although certain aspects of the second auction may have been unrelated to the Selks, gross improprieties on the part of Capital, the debtor, and the inattentiveness of the Trustee significantly contributed to the ineffectiveness of the first auction. These failings greatly contributed to the need for a second auction. Thus, the Court will not burden or penalize the estate by

authorizing that it pay twice for the services from the Trustee and the auction company.

Therefore, the Court orders that Capital will not be reimbursed for any expenses it incurred in the first auction. Capital's fees shall be limited to the payment of only those expenses it incurred in conducting the second auction. The $500.00 authorized for expenses in connection with the first auction will be applied toward expenses of the second auction. The Court authorizes that Capital be paid $5,726.35 in expenses for the second auction plus its 8% commission compensation of the gross sales proceeds from both auctions. Gross sales proceeds for both auctions was $52,-885.00. Capital's commission is $4,230.00. Capital is therefore entitled to a total payment of $9,956.00. Moreover, because of the apparent negligence of the Trustee in overseeing the conduct of the first auction, the Trustee is hereby directed to respond in writing to this Court's Sua Sponte Motion to vacate the order awarding fees to the Trustee and the Trustee's Counsel. That response is to be filed on or before May 17, 1993. A hearing on that motion is set for June 1, 1993.