**In re COMMERCIAL LOAN CORP., Debtor.**

No. 04 B 19846.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Nov. 17, 2004.

Robert M. Fishman, Brian L. Shaw, Shaw Gussis Fishman Glantz Wolfson & Tobin LLC, Chicago, IL, for Chapter 11 Trustee Richard Fogel.

Bryan I. Schwartz, Gary I. Blackman, Christopher S. Griesmeyer, Levenfeld Pearlstein, LLC, Chicago, IL, for JDI Loans, Inc.

Michael L. Molinaro, Synde B. Keywell, Neal, Gerber & Eisenberg LLP, Chicago, IL; Thomas Wilson Waters, Kemp & Grzelakowski, Ltd., Oak Brook, IL, for Flower Bank FSB, West Town Savings Bank, Howard Savings Bank and Lincoln State Bank.

David K. Welch, Arthur G. Simon, Jeffrey C. Dan, Crane, Heyman, Simon, Welch & Clar, Chicago, IL, for Ottawa Savings Bank and Twin Oaks Savings Bank.

Douglas J. Lipke, Michael M. Eidelman, Allyson B. Russo, Vedder, Price, Kaufman & Kammholz, P.C., Chicago, IL, for Citizens Financial Services, FSB.

Timothy R. Casey, Mark S. Melickian, Jason Goitia, Gardner, Carton & Douglas

LLP, Chicago, IL, for Platinum Community Bank.

### MEMORANDUM OPINION

A. BENJAMIN GOLDGAR,
Bankruptcy Judge.

This matter is before the court on trustee Richard Fogel's motion to authorize a settlement with JDI Loans, Inc., a creditor in this chapter 11 case. The motion was originally filed in June 2004 and drew objections from several other creditors, objections to which the trustee and JDI responded. In August, after a short discovery period, the court held an evidentiary hearing on the motion. The parties submitted post-hearing memoranda and replies to those memoranda in late September and early October. The matter is now ready for ruling. Having carefully considered the parties' memoranda and the evidence, the court makes the following findings of fact, reaches the following conclusions of law, and grants the trustee's motion.

### I. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a). The trustee's motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N). The court accordingly may enter a final judgment.

### II. Findings of Fact

#### A. The Transaction

Debtor Commercial Loan Corporation ("CLC") was engaged in the business of originating and servicing commercial real estate loans. As part of its business, CLC sold participations in the loans. Most if not all of the participations were sold to financial institutions.

On March 29, 2004, CLC entered into an agreement entitled "Mortgage Loan Sale and Servicing Agreement" with an entity called "JDI Loans." Under the agreement, CLC was to "sell, assign, transfer and convey" to JDI all of CLC's "right, title and interest" to seven mortgage loans with a value of roughly $3.6 million. In return, JDI would pay a "purchase price" to CLC of just over $3.2 million, or about 90% of the loans' face value. CLC would continue to service the loans and presumably would remit the proceeds it received to JDI. However, CLC would receive no compensation for servicing the loans.

The agreement also gave both CLC and JDI virtually unrestricted rights to undo the deal. CLC could repurchase one or more of the loans at any time for any reason simply by paying a defined "repurchase price" at least equal to the face amount of the loans. JDI likewise could insist that CLC repurchase any or all of the loans by paying a defined amount representing a 10% profit to JDI. JDI's option was slightly more limited than CLC's: it could only be exercised 120 days after the date of the agreement—unless a lien or other title problem arose, in which case it could be exercised immediately. The evidence indicates that it was JDI's intention even before the closing to exercise its option and require CLC to repurchase the loans.

As it happened, all seven loans were subject to 100% participations that CLC had previously sold to certain banks. The participation agreements between CLC and the banks appear to have been fairly typical of agreements of this kind. The participating banks obtained an equitable interest in the loans. Legal title to the loans, however, remained with CLC. CLC acted as the servicer on the loans, remitting the proceeds to the participants.

JDI knew that the loans were subject to 100% participations. On several occasions before the closing, JDI asked CLC's presi-

dent, Peter Heuser, to identify the loan participants. JDI also asked for information about a payoff of the participating banks, and there was some discussion among counsel over whether CLC would provide payoff letters from the banks confirming that the proceeds had been used to satisfy the banks' interests. In addition, JDI's counsel proposed that CLC's counsel act as escrowee for the purpose of forwarding the funds.

CLC, however, refused to identify the participants, never provided a payoff letter, and never established an escrow. According to David Rattner, the JDI officer involved in the transaction, JDI ultimately decided that since it was not a party to the participation agreements, it had no legal responsibility to ensure that CLC paid off the participating banks. Nonetheless, a provision was tacked onto the end of the "Mortgage Loan Sale and Servicing Agreement" stating that CLC would use "all of the purchase price" to pay amounts owed to any participants. There may also have been a separate letter agreement to the same effect.

The transaction between CLC and JDI closed on March 31, 2004. JDI wired the $3.2 million to CLC's counsel. In mid-April, the mortgages and accompanying notes were transferred to JDI's counsel. They are still in counsel's possession. The $3.2 million, however, was not used to pay amounts owed to the participants, as the agreement required. For reasons that are unclear, the entire amount was paid to a single bank, Umbrella Bank (now known as Flower Bank).

About three weeks after the notes were transferred, Rattner faxed Heuser a letter in which Rattner said that JDI had been unable to reconcile with the amounts in the loan agreements the amounts JDI had received from CLC as April payments on the loans. Apparently in response, on May 20, 2004, CLC sent JDI a check for a little more than $185,000. The money came from a CLC operating account at Oak Brook Bank, an account in which CLC had commingled funds it had received on participated loans.

## B. The Bankruptcy

Meanwhile, on May 13, 2004, CLC filed a petition for relief under chapter 11 of the Bankruptcy Code. Almost immediately, the U.S. Trustee and the debtor jointly asked the bankruptcy court to appoint a chapter 11 trustee. Several creditors made the same request, alleging that the principals of CLC, Heuser included, had been engaged in a massive fraud. Federal and state banking authorities, including the FDIC and the OTS, have been, and perhaps still are, investigating CLC's business. There are rumors of a federal grand jury investigation as well. On May 26, 2004, Richard Fogel was appointed trustee.

Even before Fogel was appointed, JDI had moved to modify the automatic stay to enable JDI itself to service the loans. Citing section 541(d) of the Code, 11 U.S.C. § 541(d), JDI argued the loans were not property of the estate (in which case, of course, a motion to modify the stay was unnecessary), and JDI should be allowed to exercise its rights in the loans. JDI's motion was opposed by four banks: Flower Bank, West Town Savings Bank, Howard Savings Bank, and Lincoln State Bank. Although he filed no formal objection, Fogel also disputed the merits of the motion. The court set a briefing schedule on the motion that extended into early July 2004.

## C. The Proposed Settlement

At the end of June 2004, however, Fogel filed a motion under Bankruptcy Rule 9019(a), Fed. R. Bankr.P. 9019(a), and section 363(b) of the Code, 11 U.S.C. § 363(b), asking the court to approve a settlement

with JDI, a settlement he said had been reached only after extensive discussions with JDI and his own independent investigation. Six creditors oppose the settlement: the four banks that objected to JDI's motion to modify the stay, as well as Ottawa Savings Bank and Twin Oaks Savings Bank.[1]

Under the proposed settlement, JDI agrees to pay the trustee $205,000; JDI assigns to the trustee its rights to any proceeds received on the loans pre-petition and deposited in the commingled CLC operating account; and JDI releases the trustee and the debtor from any claims arising out of JDI's dealings with CLC. The trustee and the debtor, in turn, release JDI from claims relating to the JDI–CLC transaction. The trustee and the debtor also acknowledge and agree that as a result of the release JDI is "the sole owner of the loans and loan documents" involved in the transaction, and the debtor relinquishes any claim it might have to the loans or loan documents. Any proceeds the trustee has received on the loans post-petition are assigned to JDI.[2]

The proposed agreement does leave the trustee an out: if within 270 days of the agreement's execution the trustee discovers facts that lead him in good faith to believe JDI engaged in "fraudulent acts" (a defined term) in connection with the JDI–CLC transaction, and if he reasonably expects to obtain more than $300,000 in damages, he can bring an action against JDI. The trustee's recovery in such an action is limited to $1 million. If less than

$300,000 in damages is awarded, the trustee gets nothing.

At the evidentiary hearing on the motion, Fogel attested to his nearly 25 years of experience as a bankruptcy lawyer and panel trustee, described the investigation he had undertaken before reaching the settlement, and explained why he preferred to settle rather than fight with JDI.

Fogel said he considered the JDI–CLC transaction to be what it appeared to be: a loan sale. The transaction, he added, was not post-petition. (That matters, presumably, because it rules out a claim under section 549, 11 U.S.C. § 549.) The transaction also did not appear to be preferential and therefore voidable under section 547, 11 U.S.C. § 547. In his view, that left as the principal question whether the transaction could be avoided as a fraudulent conveyance under section 548, 11 U.S.C. § 548. On this, Fogel concluded from his investigation that no evidence pointed to actual fraud, at least not fraud on JDI's part, that he had little chance of establishing constructive fraud, and that JDI would likely be entitled to a defense under section 548(c). In short, Fogel said, he had at best "a weak argument to avoid the transaction itself."

On the other hand, Fogel concluded he had a better claim (though "by no means a certainty") to recover the $185,000 payment CLC made to JDI post-closing. To press that claim, however, Fogel believed he would have to litigate whether there is a fraud exception to section 541(d), 11

---

**1.** The objecting creditors—except Flower Bank, apparently—are all participants in the loans CLC transferred to JDI. Two other creditors, Platinum Community Bank and Citizens Financial Services, oppose the settlement only to the extent that its approval requires the court to decide whether there is a fraud exception to section 541(d). No such decision is necessary.

**2.** With the accounting unfinished, the dollar value of the proceeds assigned to the trustee and the proceeds assigned to JDI under the settlement agreement is unknown. Fogel intimated, however, that the amounts are probably small.

U.S.C. § 541(d). Because section 541(d) concerns property in which the debtor holds only legal title and not an equitable interest, and because CLC appeared to have transferred legal title to the loans to JDI, Fogel decided the JDI–CLC transaction did not present the "the attractive fact pattern that I thought made sense to fight the fight."

Fogel did consider one other claim: whether the JDI–CLC transaction was not a sale at all but really a disguised loan and could be recharacterized as such. Although he confessed he was not "chapter and verse familiar" with the law applicable to that kind of claim, he determined the claim was not worth pursuing. Fogel reasoned that CLC had entered into a contract "to transfer the loans to somebody else in exchange for the payment of money." The transaction was therefore a sale: "they had an asset, they sold it to someone and [they] got paid." Even if the transaction could be deemed a loan, Fogel added, the loan was probably secured. Only if the sale was a loan *and* the loan was unsecured could he exercise his strong-arm power under section 544, 11 U.S.C. § 544, and retrieve the notes without having to pay JDI back its $3.2 million.

In determining the relative strengths and weaknesses of these claims, Fogel took into account the unusual problems of proof he would face should he choose to litigate. Heuser alone handled the transaction for CLC, and it appears Rattner handled the transaction alone for JDI. Nearly all of the information available to the trustee about the JDI–CLC transaction came from JDI and its counsel, who had been quite forthcoming. On the other hand, virtually no information could be had from CLC. CLC maintained no formal file on the deal, Fogel discovered, and he described CLC's records relating to JDI as "scant." Heuser and the other principal of CLC had asserted their Fifth Amendment privilege and refused to talk to Fogel.

Fogel calculated his maximum possible recovery on his best claims at no more than $585,000. If he prevailed on his "weak" fraudulent conveyance claim under section 548, and if JDI established a section 548(c) defense as he anticipated it would, the trustee estimated his recovery to be $400,000 at most: the $3.6 million value of the notes minus the $3.2 million JDI had loaned CLC that would have to be repaid.[3] Adding the trustee's claim to the $185,000 post-closing payment produces $585,000.

It is possible from the testimony at the August hearing (and from answers to questions the court posed at a subsequent hearing in October) to calculate potential recoveries on some of the other claims Fogel considered:

● If the trustee prevailed under section 548, and if JDI *failed* to establish a section 548(c) defense, the trustee would recover the notes worth $3.6 million, and JDI would have an unsecured claim worth $3.2 million. Because Fogel anticipates 50% to 80% distributions to unsecured creditors, however, he would have to pay JDI between $1.6 million and $2.56 million. Depending on the distribution, the net recovery would range from $1 million to $2 million.[4]

---

3. The court assumes solely for purposes of this ruling that the notes are still worth $3.6 million. Because payments have been made on the notes, they must be worth less. How much less is unclear.

4. Fogel's "grand slam home run" in any action he might bring against JDI would therefore be about $2 million, not $3.6 million (the original face value of the notes), as the creditors objecting to the proposed settlement occasionally imply.

• If the trustee prevailed on a loan recharacterization theory, and if the loan were found to be *unsecured*, the recovery would be roughly $1 million to $2 million—again because the notes would return to the estate but distributions to JDI as an unsecured creditor would have to be subtracted.

• If the trustee prevailed on a loan recharacterization theory, and if the loan were found to be *secured*, the notes would not return to the estate. The recovery would be the same as if the trustee prevailed under section 548 and JDI established a section 548(c) defense: $400,000. That plus the $185,000 again produces $585,000.

Against these maximum recoveries, Fogel weighed not only the relative strengths and weaknesses of the claims but also the potential cost of litigating them. Pursing the claims would be quite expensive, he concluded, for two reasons. First, the legal issues were not "cut and dried" but on the contrary were "complicated and unusual." And second, any litigation would be prolonged, conceivably involving multiple appeals. In his experience, Fogel said, "people fight hard" in fraud cases "where there is lots at stake." Confirming as much, JDI's counsel had told him specifically that "they would fight and that the fight would not end" in the bankruptcy court. Fogel estimated it would cost $150,000, and possibly as much as $250,000, to pursue claims against JDI.

In short, Fogel has determined he has no real chance of hitting a $2 million

"grand slam home run" under either a section 548 or a loan recharacterization theory. In his view, he has a maximum recovery of $585,000, and it will cost him $150,000 to $250,000 to get even that. For these reasons, he asks the court to approve his proposal to settle his claims against JDI for $205,000.

### III. Conclusions of Law

#### A. Settlement Standards

 The pivotal question in approving a bankruptcy settlement is "whether the settlement is in the best interests of the estate." *In re Andreuccetti*, 975 F.2d 413, 421 (7th Cir.1992); *In re Energy Co-op., Inc.*, 886 F.2d 921, 927 (7th Cir.1989). To answer that question, the court must compare "the settlement's terms with the litigation's probable costs and probable benefits." *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)*, 841 F.2d 159, 161 (7th Cir.1987). Relevant factors the court should consider include the litigation's probability of success, its complexity, and its "attendant expense, inconvenience and delay." *Id.* Approval of a settlement is committed to the court's sound discretion.[5] *Andreuccetti*, 975 F.2d at 421; *Energy Co-op.*, 886 F.2d at 926.

██ In exercising that discretion, the court need not—indeed, should not—decide the merits of the dispute. *Energy Co-op.*, 886 F.2d at 927 n. 6. On the other hand, the court must do more than note that the trustee "considered" particular claims. *See Am. Reserve Corp.*, 841 F.2d at 163 (reversing settlement approval

---

**5.** Strictly speaking, nothing in the Bankruptcy Code requires approval of settlements. *In re Telesphere Communications, Inc.*, 179 B.R. 544, 551 (Bankr.N.D.Ill.1994). Although Rule 9019(a) discusses approval of settlements, the Rule creates a procedure, not a substantive requirement. That procedure must be followed only when the Code itself requires court approval of some underlying

action. *Id.* at 552. In this case, court approval of the settlement is necessary under section 363(b) which requires judicial permission for the use or sale of assets of the estate. 11 U.S.C. § 363(b). "The settlement of a cause of action held by the estate is plainly the equivalent of a sale of that claim." *Telesphere*, 179 B.R. at 552 n. 7.

where bankruptcy court had merely taken note of what the trustee "considered"). The court's appropriate role lies between these extremes. The court should "canvass the issues," *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 51 (1st Cir.1998) (internal quotation omitted), for the purpose of assessing the strength of the claims the trustee wants to surrender, *Am. Reserve Corp.*, 841 F.2d at 161–62.

■ There is a similar middle ground when it comes to how critically the court should scrutinize the trustee's settlement decision. The court cannot simply "rubber stamp" the decision and must do more than take the trustee's word that the decision is reasonable. *Energy Co-op.*, 886 F.2d at 924. At the same time, settlement decisions are judgment calls. They are not "scientific," *In re Apex Oil Co.*, 92 B.R. 847, 867 (Bankr.E.D.Mo.1988), or subject to any "rigid mathematical formula," *Energy Co-op.*, 886 F.2d at 928, and they cannot be evaluated in "balance sheet" fashion, *id.; In re Lee Way Holding Co.*, 120 B.R. 881, 899 (Bankr.S.D.Ohio 1990). Some deference, then, must be given to the trustee's expertise. *Healthco*, 136 F.3d at 50 n. 5; *In re Eastwind Group, Inc.*, 303 B.R. 743, 750 (Bankr.E.D.Pa.2004). Only if the settlement "falls below the lowest point in the range of reasonableness" should the trustee's decision be disturbed. *Energy Co-op.*, 886 F.2d at 929 (internal quotation omitted); *Telesphere*, 179 B.R. at 553.

## B. The Settlement Is in the Best Interests of the Estate

The settlement here is well within that range. Fogel correctly assessed that he has little possibility of prevailing on the three potential claims he considered. Those claims would have a maximum recovery of $585,000, since Fogel has no real chance of hitting his $2 million "grand slam." Even pursuing these weak claims, however, would entail as much as $250,000 in litigation costs. Comparing "the settlement's terms with the litigation's probable costs and probable benefits," *Am. Reserve Corp.*, 841 F.2d at 161, the court has no trouble finding the proposed $205,000 settlement reasonable.

### 1. Most Objections to the Settlement Have Been Waived

■ The court has no trouble, not only because the settlement is plainly reasonable, but because most of the objections to it have been waived.

The most striking aspect of this proceeding has been the inability of the objecting creditors to decide why they object to the settlement. Continually, they have raised and then discarded particular arguments, only to resurrect the occasional argument again later. So, for example, the objecting creditors made a host of points in their initial objection to the trustee's motion. Not one of those points found its way into their post-hearing memorandum. Similarly, the objecting creditors appeared to maintain at the evidentiary hearing that the trustee has a good preference claim under section 547, failed to pursue the point in their post-hearing memorandum, and then raised it in their reply. This practice—it can hardly be called a tactic— has understandably frustrated the trustee and JDI who have felt with some justification they have had to shoot at a moving target.

■ The court shares their frustration: tracking the parties' arguments from the trustee's initial motion in June through the post-hearing replies in October has been a hopeless task. Fortunately, it is also an unnecessary one. This court has no obligation to scour the briefs and the transcript, searching out and addressing every argument the parties have made at

different stages of the proceeding. "Judges are not like pigs, hunting for truffles in the record." *Albrechtsen v. Board of Regents*, 309 F.3d 433, 436 (7th Cir. 2002) (internal quotation omitted). Arguments a party fails to raise in a timely fashion, or raises but then fails to press responsibly throughout the litigation, are waived. *Sparks v. Stutler*, 71 F.3d 259, 262 (7th Cir.1995); *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1138 (7th Cir. 1994); *Roche v. City of Chicago*, 24 F.3d 882, 887 (7th Cir.1994).

The court made quite clear that the objecting creditors would have the opportunity in post-hearing memoranda to "thrash ... out thoroughly" why the settlement should be disapproved. Accordingly, the objecting creditors are limited to the objections in their post-hearing memorandum.[6] All other points are waived.

### 2. The Trustee's Claims Against JDI Are Weak

Fogel made a reasonable determination that he is unlikely to prevail against JDI on a section 548 claim, a section 541(d) claim, or a loan recharacterization claim.

#### a. The Section 548 Claim

Fogel properly concluded, first, that a fraudulent conveyance claim under section 548 was his only possible vehicle for undoing the JDI–CLC transaction, and that his chances of prevailing on the claim were poor. His investigation uncovered no evidence of actual fraud on JDI's part, and he did not believe he could establish constructive fraud. Because JDI had given "value," and because no evidence showed JDI lacked good faith, Fogel also concluded

that JDI would be able to make out a defense under section 548(c). Even if he prevailed, then, Fogel believed he could recover no more than $400,000 on a section 548 claim.

The objecting creditors do not seriously quarrel with Fogel's $400,000 figure or with his bleak assessment of the claim, and there appears to be no basis for faulting either one.

#### b. The Section 541(d) Claim

Fogel next made a reasonable determination that his chances of recovering the $185,000 post-closing payment under section 541(d) were equally poor. Although Fogel testified several times that this was his "strongest" argument and that he had a "good shot" at recovering the payment, Fogel did not mean that his claim was a good one. He meant, rather, that he had a strong *legal* argument for a fraud exception to section 541(d). He did not believe that a fraud exception would permit him to recover the $185,000 payment.

On the contrary, Fogel explained that section 541(d), fraud exception or not, did not supply a suitable vehicle for recovering the payment. That Code provision concerns property in which the debtor has "only legal title and not an equitable interest," 11 U.S.C. § 541(d), such as a mortgage the debtor has sold but retains legal title to service. In this case, CLC transferred to JDI all of its "right, title and interest" in the loans, despite the mortgage servicing obligation CLC retained. For that reason, Fogel said (with masterful understatement), the JDI dispute did not present "the attractive fact pattern" he

---

**6.** The court understands those arguments to be three: (1) the trustee has a strong loan recharacterization claim that would enable him to recover the notes; (2) the trustee performed an inadequate investigation before entering into the settlement; and (3) the objecting creditors' complaints with the settlement

have been ignored. A fourth argument—that the trustee has a weak legal argument in favor of a fraud exception to section 541(d)—will not be addressed. As discussed below, the trustee believes section 541(d) does not apply to the JDI–CLC transaction in the first place.

needed to litigate the fraud exception question.

Again, the objecting creditors do not take issue either with Fogel's assessment of his claim to the $185,000 or his decision to live to fight another day. If there is another basis for recovering the $185,000, no party has suggested it.

### c. The Loan Recharacterization Claim

Fogel also properly considered and dismissed a claim to recharacterize the sale to JDI as a loan. And here is where the objecting creditors make their stand, contending that Fogel wants to abandon a claim on which he has an excellent chance of prevailing.

They are mistaken. Whether to deem a transaction a sale or a loan when a financial asset—a right to payment—has changed hands is an old legal problem for which there has never been an easy solution. *See* P. Pantaleo, et al., *Rethinking the Role of Recourse in the Sale of Financial Assets,* 52 Bus. Law. 159, 159 (1996) (commenting that the issue has "confounded courts and commentators for some time"); *see, e.g., Elmer v. Comm'r,* 65 F.2d 568, 569–70 (2nd Cir.1933) (terming a sale of accounts "ambiguous" and noting that it is "possible . . . to construe these transactions in either way") (L. Hand, J.).

The extensive case law is almost no help. Confronted with loan/true sale questions, courts typically adopt something resembling a "totality of the circumstances" test, declaring that the sale determination depends on the intent of the parties and requires an examination of the parties' relationship. *See, e.g., Bear v. Coben (In re Golden Plan of Cal., Inc.),* 829 F.2d 705, 708 n. 2 (9th Cir.1986); *Redic v. Gary H. Watts Realty Co.,* 762 F.2d 1181, 1185 (4th Cir.1985); *Major's Furniture Mart, Inc. v. Castle Credit Corp.,* 602 F.2d 538, 545 (3rd Cir.1979); *Tavormina v. Aquatic Co. (In re Armando Gerstel, Inc.),* 65 B.R. 602,

604 (S.D.Fla.1986); *Ables v. Major Funding Corp. (In re Major Funding Corp.),* 82 B.R. 443, 447 (Bankr.S.D.Tex.1987); *Carter v. Four Seasons Funding Corp.,* 351 Ark. 637, 655, 97 S.W.3d 387, 396 (2003).

Under that amorphous rubric, however, different courts consider different factors and give those factors different weight. T. Plank, *The True Sale of Loans and the Role of Recourse,* 14 Geo. Mason L.Rev. 287, 290 (noting that "courts do not rely upon any universally accepted set of factors"). So, for example, the language of the parties' contract has mattered little to some courts. *See, e.g., Major's Furniture Mart,* 602 F.2d at 543. To others, it is has been more or less dispositive. *See, e.g., Hatoff v. Lemons & Assocs., Inc. (In re Lemons & Assocs., Inc.),* 67 B.R. 198, 209–210 (Bankr.D.Nev.1986). Some courts find critical the purchaser's retention of some recourse against the seller. *See, e.g., Ratto v. Sims (In re Lendvest Mortgage, Inc.),* 119 B.R. 199, 200 (9th Cir. BAP 1990). Others deem it merely relevant, *see, e.g., Major's Furniture Mart,* 602 F.2d at 544, or choose to ignore it altogether, *see, e.g., Carter,* 351 Ark. at 658, 97 S.W.3d at 398.

With no "discernible rule of law or analytical approach" evident from the decisions, a court "could flip a coin and find support in the case law for a decision either way." *See* R. Aicher & W. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan upon Bankruptcy of the Transferor,* 65 Am. Bankr.L.J. 181, 206–07 (1991). The absence of any set legal analysis, along with the annoying tendency of decisions to turn on their facts, makes predicting the outcome of a loan/true sale dispute nearly impossible. *See* Hearing on Bankruptcy Reform Act of 1999 (H.R.833) (Statement of S. Grosshandler, Partner, Cleary, Gottlieb, Steen & Hamilton) (available at www.house.gov/judiciary/106–gros.htm)

(observing that the legal analysis is "highly subjective" and that issuing "true sale opinions" in connection with some transactions is therefore "extremely difficult, costly, and in a few cases, impossible").

The objecting creditors here are probably right that Fogel's analysis of the recharacterization claim was too simplistic. He concluded the transaction was a sale because the JDI–CLC agreement called it a "sale" and referred to the "transfer" of an asset, and because money and an asset had in fact changed hands. He paid no attention to the full recourse aspect of the agreement—the provisions allowing either party to undo the deal. Nor could he explain those provisions: when pressed on this point at the October 13, 2004 hearing, he could offer only the implausible suggestion that the provisions formed some kind of "extended due diligence protection."

Given (1) that JDI paid CLC $3.2 million for the notes; (2) that after 120 days JDI could return the notes and get its $3.2 million back plus a 10% profit; and (3) that JDI always intended to do just that, some courts would find the transaction was a loan. *See* Pantaleo, et al., *supra*, at 163, 179–180 (calling this form of unlimited right to return an asset "economic recourse," as opposed to "collectibility recourse" that allows return only of a nonperforming asset, and arguing that economic recourse supports recharacterization as a loan). Fogel probably has a better loan recharacterization argument than he thinks.

Still, Fogel's decision not to pursue a loan recharacterization claim is reasonable. First, as discussed above, the law applicable to loan/true sale issues is, to put it mildly, unclear. Some courts would find the full recourse aspect of the JDI–CLC agreement significant; others might not.[7] Fogel cannot know what analysis a court presented with the claim would employ and whether that court would give greater weight to the repurchase provisions or, as Fogel did, to the agreement's use of the term "sale." Although Fogel's claim has more to it than he realizes, then, the outcome on the claim remains uncertain because the applicable law is uncertain. "Uncertainty in the law" is an excellent reason to settle a claim. *Lee Way Holding*, 120 B.R. at 890 (observing that "[u]ncertainty in the law" favors settlement).

Second, and more important, it would not be enough for Fogel to convince a court merely that the sale was a loan. To return the notes to the estate and increase the recovery beyond $400,000, he would also have to show that the loan was unsecured, and Fogel correctly concluded there is little possibility of that. The reason lies in the nature of the transaction. Regardless of the label one attaches to the transaction, there is no question the JDI–CLC agreement transferred the loans to JDI and the notes themselves physically changed hands. If the transaction was a loan, the contractual and physical transfers of the notes to JDI as the lender can only have been intended to provide security for the loan. There is no other explanation.

The contractual transfer and physical transfer of the notes, moreover, were each separately sufficient to render the loan secured. Under the Uniform Commercial Code, a security interest is enforceable if

---

7. At least one commentator has argued strenuously that in analyzing loan/true sale problems, courts pay insufficient attention to contractual language. In his view, courts should respect the way the parties have chosen to describe their transaction and should ignore the contractual description of a transaction as a "sale" only in those rare instances when the seller "retains substantially all of the benefits and burdens of ownership." Plank, *supra*, at 328. In close cases, the contract terms would govern. *Id.*

value has been given, the debtor has rights in the collateral, and there is an "authenticated" agreement that "provides a description of the collateral." 810 ILCS 5/9–203(b)(1), (2), (3)(A) (2002). JDI gave value, had rights in the mortgages and notes, and signed an agreement that described the mortgages and notes. Even without a written agreement, where the debtor gives value and has rights in the collateral a security interest will be enforceable if the debtor also has possession of the collateral. 810 ILCS 5/9–203(b)(3)(B) (2002); *see generally* 4 J. White & R. Summers, *Uniform Commercial Code* § 31–3 (4th ed.1995). JDI has possession of the notes. If JDI made a loan, there is no good argument the loan was anything but secured.

The objecting creditors nevertheless attempt one. The loan was not secured, they contend, because the JDI–CLC agreement contained no express "granting clause" conferring a security interest. In support, the objecting creditors cite *In re Martin Grinding & Machine Works, Inc.*, 793 F.2d 592 (7th Cir.1986).

■■■ With the notes in JDI's hands, of course, no written security agreement was necessary. Even so, the objecting creditors are mistaken in asserting that a security agreement requires a formal "granting clause." That notion, known as the "express grant" or "American Card" rule after *American Card Co. v. H.M.H. Co.*, 97 R.I. 59, 196 A.2d 150 (1963), never had much currency and "has been fiercely criticized and ultimately rejected." *Bank of Am., N.A. v. Outboard Marine Corp. (In re Outboard Marine Corp.)*, 300 B.R. 308, 321 (Bankr.N.D.Ill.2003); *see also Meeks v. First Bank (In re Tracy's Flowers & Gifts, Inc.)*, 264 B.R. 1, 5–7 (Bankr. E.D.Ark.2001). "[N]othing in § 9–203 requires that the 'security agreement' contain a 'granting' clause." *Outboard Marine*, 300 B.R. at 321 (internal quotations omitted); *see also United States v. Hollie (In re Hollie)*, 42 B.R. 111, 117 (Bankr. M.D.Ga.1984). The *Martin Grinding* decision concerns the adequacy of the description of the collateral, not the necessity of a granting clause.[8] *Martin Grinding*, 793 F.2d at 594.

Because uncertainty in the law makes the outcome of a loan recharacterization claim nearly impossible to predict, and because there is little chance the loan will be found unsecured (if indeed it turns out to be a loan), Fogel rightly determined that his loan recharacterization claim is a weak one.[9]

---

**8.** That the objecting creditors would resort to this formalistic argument is ironic. When the question is whether the transaction was a sale or a loan, they insist the agreement's language must be ignored and the "economic reality" of the transaction examined. The explicit description of the deal as a "sale" means nothing. Once the transaction is deemed a loan, however, the objecting creditors reverse course, arguing that the agreement's language is critical, and that the failure explicitly to "grant" a security interest means everything.

**9.** At the evidentiary hearing, the objecting creditors presented the expert testimony of Edward Szarkowicz, a lawyer with commercial lending experience, who opined that

JDI's failure to obtain a payoff letter was not "commercially reasonable." By that, Szarkowicz meant that JDI acted inconsistently with standard industry practices and was foolish. This testimony was presumably offered in connection with the loan/true sale question.

But whether JDI made a mistake in not obtaining a payoff letter says nothing about whether the transaction was a loan or a sale. CLC's failure to pay the loan participants meant simply that the notes remained subject to the participants' equitable interests. JDI therefore received an encumbered asset— whether JDI bought the asset outright or merely took it as security. The continued equitable interests of the loan participants in

### 3. The Claims Are Complex and Expensive to Pursue

Balancing the complexity of the claims and the potential costs of litigation against the probable outcome of these claims, *Am. Reserve*, 841 F.2d at 161, the court is compelled to find the proposed settlement reasonable.

As Fogel rightly observed, the legal issues here are "complicated and unusual" rather than "cut and dried." This is especially true of the loan recharacterization claim, the only claim the objecting creditors are pushing him to pursue. Litigating that claim would require the trustee to sail into legal waters not so much uncharted as charted differently by everyone who has had the misfortune to venture into them. Not only is the case law all over the place, but there is an extensive secondary literature (always a bad sign) that is itself notable for the different approaches it recommends.

The cost of litigating these complex claims, meanwhile, would be considerable. Fogel testified that JDI had told him directly it would fight any action he brought, through multiple appeals if need be. The trustee has no doubt about JDI's willingness to go to the mat with him, and no objecting creditor has claimed JDI is bluffing. Under the circumstances, Fogel's estimate of $150,000 in attorneys' fees and costs to litigate with JDI is conservative. His $250,000 figure seems more realistic.

Finally, the court gives substantial weight to the trustee's opinion that the settlement is in the estate's interest and should be approved. *See In re Del Grosso*, 106 B.R. 165, 168 (Bankr.N.D.Ill.1989) (in evaluating settlement, court may "give weight to the opinions of the Trustee" and others). Fogel is a capable and experienced bankruptcy lawyer and trustee who

the notes do not point to one kind of transac-

has been evaluating and litigating the claims of bankruptcy estates for almost a quarter of a century. He would unquestionably pursue claims against JDI if he thought there were some profit in doing so. Fogel thoroughly investigated the JDI–CLC transaction. His decision to settle rather than litigate deserves deference. *See Healthco*, 136 F.3d at 50 n. 5.

### 4. The Remaining Objections to the Proposed Settlement Are Meritless

The objecting creditors offer two other objections to the settlement. Both are procedural. Neither has merit.

The objecting creditors complain that the trustee failed to conduct an adequate investigation of his possible claims against JDI before proposing the settlement. Not so. Fogel examined what few files CLC had on the loans, examined all of the files at the offices of CLC's counsel, and spoke to CLC's loan administrator. He obtained from JDI all of the documents JDI could assemble relating to the transaction. According to JDI, many of these documents were privileged but were nonetheless voluntarily produced. Fogel met with examiners from the FDIC and OTS. His counsel attended the depositions of Rattner and another principal of JDI.

 A trustee must be "sufficiently informed to make an objective and intelligent decision" about settlement, true enough. *Lee Way Holding*, 120 B.R. at 897. He should have "familiarity with a case, its factual patterns, legal theories, and evidence." *Id.* But he "need not be so familiar with the case as to be prepared for trial." *Id.* A trustee also has a duty to preserve estate assets, *In re Chicago Art Glass, Inc.*, 155 B.R. 180, 188 (Bankr. N.D.Ill.1993), and an exhaustive investiga-

tion over the other.

704

tion would be wasteful, *Lee Way Holding,* 120 B.R. at 897 (noting that expense of gaining intimate knowledge of the case would leave "little reason to explore settlement"). Fogel's extensive investigation was more than enough to enable him to make an intelligent decision on settlement. If the objecting creditors believe Fogel should have done something more, they fail to say what.

The objecting creditors also assert that the trustee gave short shrift to their views. The views of creditors are important, they say, and should be heeded.

■ The objecting creditors overstate matters. Certainly, in determining whether to approve a settlement a court "should ... consider the creditors' objections to the settlement." *Am. Reserve,* 841 F.2d at 161–62; *see also Del Grosso,* 106 B.R. at 168 (stating that the court should consider the interests of creditors and give "proper deference to their reasonable views"); *Apex Oil,* 92 B.R. at 867 (same). And although JDI claims opposition to the settlement comes from just "two sets of creditors," the court recognizes those six creditors represent nearly 90% of the unsecured debt in the case.[10]

■ The objections of creditors, however, "are not controlling." *Am. Reserve,* 841 F.2d at 162. The court may approve a settlement even over those objections "if the settlement is in the best interests of the estate as a whole." *Del Grosso,* 106 B.R. at 168; *see also Lee Way Holding,* 120 B.R. at 903–04, 909. The court has carefully considered the objections of the creditors here and has determined the settlement is in the best interests of the estate as a whole, notwithstanding those objections.

The objecting creditors' blunderbuss strategy in this proceeding considerably diminishes the force of their objections in any event. The tendency of these creditors to serve up a new argument *du jour* in every paper and at every court appearance suggests they are bent on derailing the settlement for reasons of their own, reasons that have little to do with the estate's interest. *Cf. Lee Way Holding,* 120 B.R. at 904 (where unusually contentious creditor raised a multitude of objections to settlement, court found creditor "motivated by considerations not common to all creditors"). In proposing the settlement, Fogel has the CLC estate's best interests in mind. So does the court in approving it.

## IV. Conclusion

Faced with questionable claims in complex areas of the law, a bellicose opponent determined to contest those claims, problems of proof, possible litigation costs of $250,000, and a maximum recovery of only $585,000, Fogel proposes to give up his claims, save the fees, and get an immediate payment of $205,000. The court finds the proposed settlement to be in the best interests of the CLC estate. Trustee Richard Fogel's motion to authorize a compromise and settlement with JDI Loans, Inc. is granted. A Rule 9021 judgment will be entered consistent with this opinion.

---

10. The 90% figure is based on the proofs of claim filed to date and assumes those claims are accurate. These six creditors have filed unsecured claims in the CLC bankruptcy totaling $37,803,077. The total amount of unsecured claims in the case is $42,824,337.